UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

    vs.                                   Case No. 20-cr-20-jdp

DANIEL PEGGS,

        *Defendant.*

---

## FIRST PRETRIAL MOTION:
## MOTION FOR BILL OF PARTICULARS

Daniel Peggs, by counsel, files this motion for a bill of particulars. At its core, a bill of particulars is meant to fairly apprise the defendant of the charges against him so that he can prepare a defense and avoid surprise at trial. They're usually issued in cases with voluminous discovery or where the indictment fails to advise the defendant of the conduct that's alleged to have violated the law. Here, both scenarios apply. The discovery is so voluminous and the government's allegations are so amorphous that, without a bill of particulars, the defense cannot be prepared for trial.

Currently the discovery tops 171,588 pages, including recorded interviews, various spreadsheets full of data, and cell phone downloads, which put the real total closer to a quarter million pages. And then there are the hundred or so videos from the North Carolina investigation. All of this information concerns Peggs's sexual relationship (in 2015 and 2016) with Jane Doe—when she was allegedly seventeen. Based on their various encounters, the government has charged Peggs with producing child

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

pornography (tied to an instance where they slept together and she had it recorded on her iPhone); with receiving child pornography (tied to two pictures Doe sent him); with possessing child pornography (from a Limewire download in 2008); and with human trafficking (tied to Doe's allegations that Peggs arranged for repeated instances of group sex where money changed hands). There are various defenses to all of these charges. But the need for a bill of particulars focuses on the human-trafficking charges.

The government's theory of human trafficking centers on group-sex encounters—something made clear by the discovery, grand jury testimony, and informal discussions with the government. The theory falls along these basic lines: Peggs committed human trafficking with Doe, by arranging for group-sex where some of the men paid him for the hotel and where Peggs would give some of the money to Doe. Here is her grand jury testimony on that point:

> So what would happen with the group sessions is he would get a hotel room. Then I would show up. *And then we would find other people to show up, usually as many people as possible*. And sometimes during that, at one point I specifically remember there would be people coming in and out, you know, coming and going. And as they would leave, sometimes they would leave money, um, you know, for the hotel room or something. *And at one point after that he had given me some money*.[1]

When asked: "did you ever hear him ask for it, or was it just something that was provided," Doe's testimony was candid: "I don't actually know."[2] But she did confirm that "he got the money and he gave [her] some of it" and he said something to the effect

---

[1] Bates 3538
[2] Bates 3538

of "[t]hat's just your cut."[3] This scenario was supposed to have been repeated multiple times (possibly ten or more), including once at the Microtel in ███████.[4] That's the government's theory.

After shifting through the discovery, it's the defense's theory that Doe has confused (or conflated) her behavior with other men and attributed it to Peggs. Nothing in the discovery substantiates her allegations. And when investigators have looked to back them up (and they've looked), the evidence has pointed to other actors. This includes interviews where Doe identifies specific men she says she and Peggs had group sex with. When the men were interviewed, they all admit to having sex with Doe; but they didn't know Peggs, and the sex wasn't during the time period Doe claimed. Instead, they identified another man as being behind the group sex, and they all put the sex at a time outside of the indictment—when Doe was an adult.

While substantial portions of the investigation establish that Doe's allegations against Peggs are misplaced, the government's tally has Peggs trafficking Doe ten (or so) times. To defend against these allegations and prepare for trial, the defense needs a bill of particulars, setting out the following:

1. Alleged dates that Peggs trafficked Doe;

2. The alleged means of this trafficking; and

3. What actions amounted to a commercial transaction.

---

[3] Bates 3539
[4] Bates 3539

None of this information is set out in the Indictment. And without this information, the defense cannot prepare for trial—we have no sense of what to expect in the way of evidence establishing these instances or how to defend against them, particularly establishing a months' long alibi.

As it stands, this trial will take weeks—the defense is faced with establishing daily alibis for a seven-month period, outlining how Peggs did not (and could not) have trafficked Doe. A bill of particulars turns this into a focused five-day trial. At that trial, the defense is straightforward: Peggs didn't do this, Doe has confused what happened with other men and attributed it to Peggs. But to keep this trial tight, and to allow the defense to prepare (and avoid unfair surprise), the defense needs a bill of particulars.

## I. The case's factual background

What follows is an admittedly lengthy recitation of the case's facts. This much should be obvious: Doe's life is simply tragic. In setting forth these details, the defense is not blaming her for what has happened, but setting out why we need a bill of particulars to defend Peggs. While it's very clear that Doe engaged in prostitution and occasionally received money *after* (but not for) sporadic group-sex sessions, this happened apart from Peggs and (in some instances) well *after* the range of dates charged in the indictment: October 2015 to May 20, 2016. Instead, many instances that mirror her allegations against Peggs happened with different people far after the charged period, and when she was undeniably an adult.

### A. Doe's introduction to hard drugs and prostitution

During her early high-school years, Doe was a somewhat ordinary teenager. Unfortunately, by fifteen, she started dabbling with some dangerous behavior—this included using explicit dating websites.[5] By sixteen, she was alternatively posting ads for anonymous sex with older men and looking for a "sugar daddy."[6] Her life took a turn for the worse when she met an older man, who was in college. He focused less on his studies and more on using and selling drugs—during their time together, he led Doe into using LSD, marijuana, ecstasy, molly, and heavy psychedelic mushrooms.[7] This was not simple

---

[5] Parsed Search Queries p. 716, 913, 1084, Porn Searches p. 14
[6] Bates 1725
[7] Bates 1723; ███████████████ p. 630

recreational use; rather, for a time, their lives seemed to desperately revolve around getting and paying for the drugs.[8]

████████████████████████████████████████████, ████████████████

████████████████████ ██████████████████████████████████████

████████████████████████████████████████████████████████████

████ ████████████████████████████████████████████████████████

████████████████████████████ ██████████████████████████████

██████████████████████

**B. Doe meets Bryan Ragon: the key player in this story.**

After the breakup, Doe got more and more into the BDSM lifestyle.[13] ████████

██████████████████████████████████████████ where she met Bryan Ragon—the case's key player. He worked in IT and lived in North Carolina; but he also had a side gig in a traveling theatre troupe.[14] Immersed in the BDSM lifestyle, Ragon was a self-proclaimed sexual voyeur.[15] Within days of meeting, the two discussed Ragon's desire to watch her have sex with other men.[16]

---

[8] Bates 1725
[9] Bates 1725
[10] Bates 1725
[11] ████████████████. 1892, 1129, 786, 868
[12] Bates 494
[13] Doe's Google Searches p. 821
[14] Bates 473
[15] Tinder Chats ███████████████ p. 77
[16] Bates 438; MMS – Bryan Ragon p. 77

A week later, Ragon returned from ████████ to Minnesota with the troupe; he and Doe stayed together.[17] After this, the relationship took another turn—Ragon officially became her "dom," telling her what to do, what to wear, and who to sleep with.[18] Ragon's "thing" was to watch (or listen to) Doe having sex with other men.[19] To fulfil this desire, he arranged for her to meet up with random men for sex.[20] There was, however, a condition: the men had to agree that Doe could film or livestream it. The videos were then shared with Ragon—sometimes the videos were saved (and later shared), sometimes they were livestreamed, and sometimes just the audio was livestreamed.[21] By Ragon's count, this happened with about 60 men.[22] By Doe's estimation, the number exceeded 80.[23]

Among the first to respond to Ragon's ads was a man named ████████ another key player in the case.[24] (*N.b.* The defense believes that most of Doe's behavior with ████l is being attributed to Peggs, particularly the human trafficking). Doe agreed to have sex with ██████, but on one condition: he had to let her record it.[25] While Ragon supervised over skype, Doe captured at least two videos.[26] These were sent to Ragon, who praised Doe: "Seriously proud of you for last night, my kitten. And very happy that

---

[17] Bates 497
[18] Bates 502
[19] Ragon's Proffer, p. 159
[20] Bates 553 & 554
[21] Bates 502
[22] Ragon's Proffer, p. 39
[23] Bates 423
[24] Bates 35072 (List of Guys), 44058 (Screenshot), 3457 (Phone Calls), MMS- Bryan Ragon p. 257 & 358 (Screenshot)
[25] Bates 44058
[26] Bates 43995 & Bates 43996

you got pics/video and was on skype with me for it."[27] That month, the pattern repeated itself with at least seven different men and likely several others.[28] The defense has used the qualifier "likely," because the texts imply it happened, but it's not clear.

As October wore on, Ragon's demands increased. He vacillated between getting more and more recordings of Doe having sex and wanting her to engage in group-sex.[29] Around this time, he started insisting that before men could have sex with Doe (including those she'd previously slept with), they had to agree to either tape the session *or* bring other men to the rendezvous.[30] It's unclear how many of these group-sex sessions took place, the contemporaneous evidence indicates these were difficult to arrange.[31] It's also unclear how many of these group-sex sessions were videotaped (there is evidence a few were) or simply listened to by Ragon (that did happen).[32]



---

[27] MMS-Bryan Ragon p. 277 - 279
[28] ████████████████████████████████
████████████
[29] Bates 97
[30] ██████████
█████████
[32] Bates 502
[33] Transcript of Meyer Interview p. 78-80
[34] Bates 3772
[35] Bates 665 & Jane Doe's google Searches p. 2572 & 2573

██████.[36] Beyond the back-story, Doe took it a step further: skilled with computers and photography, she created a very, very good fake ID.[37] And it wasn't so she could sneak into bars (as a 21-year-old) it was to be 19—an adult. It was not until late November that Ragon learned she was a minor when he bought her a plane ticket to visit ████ ████.[38] Until then, he (like the others) fully believed that she was an adult.

From this bizarre set of facts, three points must be made clear. First, in all of these encounters, Doe *always* insisted that she wanted the videos for herself or Ragon—and these were *all* recorded on her phone or the phone Ragon bought.[39] Apart from a single instance with █████ it does not seem that any other person (besides Doe) recorded these sex acts with her or that they were shared with the men Doe had sex with.[40] Second, Ragon was always keyed into these encounters (arranging and then watching or listening) and he was adamant that Doe not engage in any prostitution.[41] Third, Doe went to great lengths to convince Ragon and the other men that she was 19 and in college.[42] Those points underscore and inform the rest of what follows as Peggs enters the picture.

---

[36] Bates 17, 130, & 153
[37] Images provided by Jon Meyer
[38] Bates 43359
[39] Bates 3525 & 3527
[40] Bates 44000
[41] Bates 42
[42] Transcript of Meyer Interview p. 78-80

## C. Responding to a Craigslist ad: Peggs enters the picture.

As Ragon and Doe were posting advertisements on Craigslist, Peggs was leading a double life. Working as a principal, he was married with children, and a serial philanderer.[43] The discovery reveals numerous affairs: some long term, others were one-night stands or a series of seemingly random encounters.[44]

In late October 2015, Peggs responded to one of Doe's Craigslist posts.[45] After emailing (and making sure the other wasn't fake), Doe and Peggs exchanged numbers—Peggs said his name was Jake Thompson.[46] Peggs met her on October 23, at a ▇▇▇▇ motel that he rented. He and Jane Doe have sex, and throughout the evening two additional men came to the hotel and had sex with her.[47] This was all streamed from Doe's phone to Ragon, who recorded it. At the end of the group-sex session, one of the other men leaves money for the hotel. There is a short discussion about it (with the participants) and how considerate it is that he chipped in for the room. Afterwards, Peggs leaves the hotel and forgets the money. But minutes later, he comes back in and grabs the money for the room and leaves.

A week later, the group-sex session is repeated with other men; it is also streamed to Ragon who captures it. At this session there is no money exchanged or contributed from the other participants. In an early meeting with law enforcement, Doe suggests that

---

[43] Bates 43539-43548, 169280 & 169281
[44] Bates 2152, 2223, 2322, 2275, 2385
[45] Bates 3528
[46] Bates 503
[47] Bates 502

it's at this meeting that she shows Peggs her fake ID.[48] She tells Peggs that she's a teacher's aide; he tells her that he's a principal.[49] The next day, each googles the other.[50] But since both are lying about themselves and non-descript about where they're employed the searches are off. She looks for "youngest principal"; he looks for ███████████████ ███████████████████████████████████ ████████████████████ ████████████████████████████████ .

Peggs and Doe allegedly met again in November. There is, however, little in the discovery substantiating this encounter.[52] Then in December, Doe and Peggs met again at a ███████████████████ .[53] There, Doe made it clear that if (like the others) Peggs was going to sleep with her, it had to be recorded.[54] That night, two videos are produced on Doe's iPhone—taken 25 seconds apart. Those videos form the basis for the production of child pornography charges.[55]

At some point, "a relationship" developed between Peggs and Doe. In one of her interviews, Doe described it this way: "Dan was kind of like—this is going to sound really weird, but like a friend to me…I would sometimes just talk to him…He was more—not

---

[48] Bates 505
[49] Bates 3530
[50] Jane Doe's Google Searches p.1658
[51] Jane Doe's Google Searches p.1658 & Bates 2052
[52] Ragon's Proffer p. 49
[53] Bates 2773
[54] Bates 3520, 3521, 3525, 3527
[55] Bates 1604 & 1609

invested, but he was more interested in a long-term thing."[56] As this continued, she and Peggs met once more in December, ████████████.[57]

A few weeks after this encounter with Peggs, Doe traveled to visit Ragon in North Carolina.[58] This trip seemed to sour her on Ragon and his demands. His role changed when Doe got back to Wisconsin. To be clear: Ragon is still in the picture, getting updates from Doe, and sometimes listening to (or watching) her have sex, but the intensity and frequency of his communication and demands lessened.[59]

In early January, Peggs texts Doe: "I have forgotten what you look like."[60] And she sends him two pictures, one is her nude in a rope harness.[61] They text back and forth over the next couple of days, trying to arrange a time to meet. Then on Martin Luther King day, she texts: "no school today" (consistent with her story to Peggs that she's a teacher's aide).[62] And he responds that "he does."[63] So they can't meet up.  In the search-warrant affidavits, the agents represent that Peggs knew Doe was underage and in support they mention text messages and quote Doe as having stated, "I'm literally in high school right now."[64] And the affidavit notes that Peggs responds, "Oh, I'm a principal at a high school and I'm at work right now."[65] Of course, Doe texting that she's "literally in high school

---

[56] Bates 506 & 507; Transcript of Meyer Interview p.176 & 177
[57] Bates 43923
[58] Bates 508
[59] Bates 510
[60] Bates 1985, 3665
[61] Bates 3668
[62] Bates 1927
[63] Bates 1927
[64] Bates 1902
[65] Bates 1902

right now" would go a long way to establishing that Peggs knew she was a minor. But

here is the actual screenshot provided in discovery, taken on January 18, 2016, Martin



Luther King day:[66] As an aside, it's worth noting that from the text, Peggs believes that

Doe can purchase a hotel room—that would, of course, be impossible if she were, in fact,

a minor. Those points are, however, for another day.

---

[66] Bates 1927 & 3688

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**D. When they learn each other's identity, things fall apart between Peggs and Doe.**

In early February, Peggs invited Doe to stay with him in the Wisconsin Dells — he had a certification course.[67] This is where things unravel. While Peggs was out, Doe went through his things and discovered Peggs's identity.[68] Until then, he went by Jake Thompson — as the Court can see from the screenshot on the last page. After learning Peggs's real name, Doe googles him the next day, uncovering many details about his life.[69] After learning Peggs's secret, Doe reveals hers: she's 17.[70] This is how she described the event in her interview: "Like, when he found out I was underage, he was like, "'Well, then what's the photo you showed me, that ID?' I was like, 'Oh, this is my real ID. I'm real good at Photoshop.'"[71]

After this trip to the Dells, Peggs and Doe had no further contact until the late summer, *after* she turned 18 and outside the indictment. Doe places the next rendezvous as happening over that summer; the credit card receipts place it as July 26, 2016. [72] There are two points worth stressing. First, Doe was clear that all of her encounters with Peggs took place at a hotel. During her third interview with police, Doe is asked, "[d]id it always take place in a hotel with him, or was it ever just in his car" and she responds, "I think it was always in a hotel."[73] Second, according to hotel and banking records that we have,

---

[67] Bates 3724
[68] Bates 3530
[69] Bates 43368
[70] Transcript of Meyer Interview, p. 145
[71] Transcript of Meyer Interview, p. 145
[72] Bates 43728, *id.* at 43194
[73] Transcript of Meyer Interview, p. 137

Peggs had 12 hotel stays between October 2015 and May 2016—the indictment's timeframe. Some of these are, however, not with Doe. During that period, Peggs was (again) having multiple affairs with various women.[74] So not every hotel stay reveals an encounter with Doe, let alone a night of potential trafficking. Indeed, on some nights while Peggs is in a hotel, ███████████████████.[75]

### E.  Doe meets with ██████████ police in 2016 but doesn't report or mention Peggs.

After Peggs learned Doe's age and broke things off until she turned 18, Doe's life continued as it had but with (it seems) increasingly less contact with Ragon. ████████ ████████████████████████████ ███████████████████████████████ ████████████████████████████ ██████████████████████████████████ ████████████████████ ████████████████████ ████████████████████ █████████████ ███████████████████████████████ ████████████████████ ████████████████████████████████.[82] It's a thorough investigation, capturing over fifty pages of screenshots with various men,

[74] Bates 2789 & 2051
[75] Bates 35034
[76] Bates 1722
[77] Bates 1736-1784
[78] Bates 1723
[79] Bates 1723
[80] Bates 1722
[81] Bates 1721
[82] Bates 1721

arranging dates and negotiating prices.[83] None of these text messages are with Peggs; though a few are with Ragon.[84]

### F. Doe continues her sporadic contact with Peggs and continues to engage in group sex with ████

In July of that summer (after Doe turned 18), Peggs looks her up on the internet, and they meet up at the Microtel in ████████[85] Around this time, Doe alleges that Peggs takes her to have group sex with a married couple.[86] After this encounter, she and Peggs have increasingly less contact. Over the coming months, each shows up sporadically in the other's internet searches.[87] Finally, in late December 2016, she updates Peggs's contact info in her phone; it goes from Jake (Craigslist) to Jake (Daniel) Peggs.[88] And in April of 2017, Doe texts Peggs: "Hello stranger."[89] He doesn't respond.

Then in the fall of 2017 (when she's 19), Doe begins ████████████ (again, the case's other key player)—her first "date" arranged by Ragon back in 2015.[90] Over the next fourteen months, when she's dating ██████ Doe repeatedly and frequently posts Craigslist ads looking for group-sex encounters.[91] The following are two examples of many similar advertisements posted from Doe's email account:

| Advertisement's Title | Advertisement's Body |
|---|---|
| Looking for something very discreet and kinky TONIGHT – m4m – Eau Claire[92] | I am a woman looking for someone to play with my boyfriend who is bi. We had the idea of me tying him up and blindfolding him, then leaving with the door unlocked so that I can direct someone to go in and play with him without him ever seeking them. If this is something you would like to do please email me a face pic and dick pic so I can decide if I want it buried in him. His stats are listed down below. |

| Couple (20-25) looking for some discrete bi fun – mw4m - Eau Claire[93] | Just a couple looking for some discreet fun tonight or possibly later this week. We can host. Please send face pic and age if you want us to respond. We both like to be f\*cked, the male is strictly a bottom, sorry boys ;p |
| --- | --- |

Again, most of these posts occur during the time she's dating ████████ Interspersed in these Craigslist posts, Doe repeatedly advertises for prostitution—when added up, there are 31 ads for prostitution and 22 for group-sex. [94]

Around this time, it seems, Doe meets up with the "J-Group"—a club of sorts in the Minneapolis area that gets together for group-sex encounters. Doe's description of the "J-Group" is important:

> It's a group of guys that just get together and have, like, group sex with one person… It was a weird situation and that was one of the situations where the guy who organized all of it said, you know, "Throw in money for the hotel room."—To the guys.[95]

Recall: The allegations against Peggs are that *he* arranged group sex and had everyone throw in and give some money for the hotel room that he then gave her.[96] It's unclear

[83] Bates 1741
[84] Bates 1728 & 488
[85] Bates 2774, Bates 43525.
[86] Transcript of Meyer Interview, p. 148 & Bates 43764
[87] Bates 43367 & 2038
[88] Bates 42608
[89] Bates 30456
[90] ██████████████████████████████
[█] ████████ 2937-2994
[92] Bates 2961
[93] Bates 2956
[94] Bates 2937-2994
[95] Transcript of Meyer Interview, p. 210 & 211
[96] Bates 3538

how many times Doe met up with the J-Group or what all of the group-sex encounters that she and ███████ posted about entailed. The investigators did not inquire about those details.

As Doe and ███████ continued to date, Peggs reached out one final time. In April 2018, Peggs and Doe have this exchange, which is their last contact:

| Peggs | When can I see you again? |
|-------|---------------------------|
| Doe | Dude we always make plans and you never follow through. So like probs never |
| Peggs | That is not the rep I want, sorry. Not cool on my end |
| Doe | It's just happened enough times now that I'm kinda just done, you know?[97] |

After this, each moves on with their lives.[98]

### G. Doe's interviews and the evolving story of being trafficked.

Seven months after that text, in November 2018, Doe calls the ███████ Police Department and leaves a message "explaining her situation."[99] A ███████████████ ████████████████████████████████████████████████ ███████[100] During a welfare check, Doe reported that when she was a minor, she was in a sexual relationship with a 36-year-old man (Ragon), who sold her in ███████████ to 14 men for sex.[101] She said that she had told ███████████ about it in 2016, but at the time, she didn't want to press charges.[102] Now she was ready to talk about it.[103] Doe's

---

[97] Bates 43278
[98] Bates 2094
[99] Bates 727
[100] Bates 43313
[101] Bates 43317
[102] Bates 43317
[103] Bates 43317

allegations, naturally sparked law enforcement's attention.[104] The investigation initially focused on Ragon and the allegation that when she went to ███████████, she "was sold for sex with 14 men."[105] In the initial phone interview with police, there is no mention of Peggs, only Ragon.

     i.     **O'Donahue's initial interview focuses on Ragon and Peggs—the superintendent.**

Days after Doe's report of being sold for sex, O'Donahue conducted a follow-up. Doe brought a dossier on the men she was involved with in late 2015-16; with notecards including names, addresses, dates, family information, and shorthand descriptions of each.[106] The focus was initially on Bryan Ragon and what happened in ████████████████.[107] Then, O'Donahue, asked about "the superintendent" and if she remembers his name. She responds, ████████ who is, according to the notecards, █████████████████████ ██████████████████. That's put aside and she's nudged, "at the school?"[108] Doe then discusses Peggs. She explains that he took her all around Eau Claire and the Twin Cities to have sex with men.[109]

When asked how many of her "encounters" Peggs was involved with, she puts it at half, so forty men.[110] Their encounters were "always in a hotel."[111] And she recalled,

---

[104] Bates 423
[105] Bates 423
[106] Bates 493
[107] Transcript of O'Donahue Interview, p. 14
[108] Transcript of O'Donahue Interview, p. 15
[109] Transcript of O'Donahue Interview, p. 80
[110] Transcript of O'Donahue Interview, p. 80
[111] Transcript of Meyer Interview, p. 137

one where there was money exchanged.[112] This is how she described it: "they would, like, put money on the table. They would just throw down money for the hotel room… And I think he kept all of that… for the hotel room."[113] O'Donahue then asked if this was at "the AmeriVu?" and Doe responds: "Yes, definitely the AmeriVu."[114]  It's a lengthy interview and there was lots of follow up to be done about both Ragon and Peggs, but also Doe's other allegations. She brought a half-dozen note cards about other men besides Peggs and Ragon.

    **ii.**    **Meyer's interview breeds confusion over the commercial sex acts.**

The investigation was too big for O'Donahue, so she contacted DCI and the case was assigned to Agent Meyer. The interview initially focuses on the sex being videotaped.[115] Doe says the sex was always videotaped or livestreamed for Ragon—he wanted to see or listen to it.[116] After nailing that down, Meyer shifted to the allegations of trafficking or forced prostitution, specifically concerning Peggs. And Doe says that Peggs had, in fact, discouraged her from engaging in commercial sex acts:

> Like, he never—I actually—the first time I did, you know, get  money for something like this, I had told him about it, because we would just talk like that, and he was like, "That's actually really dangerous. Probably shouldn't do that. . . . *Like, he—he warned me against it.*"[117]

---

[112] Transcript of O'Donahue Interview, p. 117
[113] Transcript of O'Donahue Interview, p. 117
[114] Transcript of O'Donahue Interview, p. 117
[115] Bates 505
[116] Transcript of Meyer Interview
[117] Transcript of Meyer Interview p. 164 (emphasis added).

Meyer pressed: "So specifically sex for money, he warned against it" and Doe responds, "yes."[118] Meyer continued: "Okay. Did he say why it would be dangerous?"[119] And Doe responded:

> Well, I mean, he already knew that—he was, like, "Well, you're already going out and meeting random strangers, but also that is, like illegal -- really illegal." And I was like, "Yeah, you're right. That is. I really need to think about this."[120]

From there, she described how Peggs knew what he was "doing was wrong," because "when we met up, I would spend the night with him."[121] Meyer didn't press her on what she meant by "doing was wrong" and whether it referred to Peggs's extramarital affairs or something else.

As the interview went on Meyer pressed Doe on when she received money.[122] She says: "I can't remember if it was an actual solid, like, 'Hey, throw in something for the hotel,' or if one person did it, like, 'Oh, here's something for the hotel,' and then other people started doing it."[123] Later, Meyer specifically asked about Peggs paying her: "Did Dan ever pay you in exchange for sex?" and she responded, "No, not that I recall."[124] Confused, Meyer then asks, "So why did some of these other guys pay you money and some didn't?" Doe responds: "So I—let's see. I think—I can't remember if it was me or

---

[118] Transcript of Meyer Interview p. 165
[119] Transcript of Meyer Interview p. 165
[120] Transcript of Meyer Interview p. 166
[121] Transcript of Meyer Interview p. 166
[122] Transcript of Meyer Interview p. 149
[123] Bates 510 & Transcript of Meyer Interview p. 149 & 150
[124] Transcript of Meyer Interview p. 179

Bryan, but eventually, an ad posted was, like, an arrangement rather than a meetup. I think. I could be wrong. ████████████████████████████."[125]

As the interview wrapped up, Meyer circled back to money, and the allegation that Ragon had "sold" her to 14 men. "Was there ever any talk of money, or do you think that this was just strictly him getting just sexual—a sexual fantasy? You know, was that enough for him, or do you think that there was some financial component to this?"[126] She was clear: "He never asked me for money." Then she added: "There might have been a couple of times where it was like, 'throw in for the hotel room,' if there were other people coming in and out."[127] And (again this is about Ragon) she added this about his knowledge of the money being exchanged: "'Yes, this is something you can do blah, blah, blah. You have to be careful though, and he knew I was doing it."[128] Then she added that Ragon watched or listened to the ones that she got paid for: "████████████████████ ██████████████████."[129] After mentioning ██████ she added an important point: "I don't know if I have any contact info about them, but he specifically had information about this group in the Cities that they called themselves, like *J-Group or something, and he kept pushing me to go see them, and I—I never did, but think that was another situation where it would have been, like 'oh, throw in for the hotel.'"*[130]

---

[125] Transcript of Meyer Interview p. 179–80 (emphasis added).
[126] Transcript of Meyer Interview p. 208 & 209
[127] Transcript of Meyer Interview p. 209
[128] Transcript of Meyer Interview p. 209
[129] Transcript of Meyer Interview p. 209
[130] *Id.* (emphasis added).

Finally, in the interview the numbers shifted once more. From the report, Doe "believed that Peggs only facilitated sex with groups of 4 or more people once or twice. *Most of the group sex sessions occurred with one or two other people [Doe] believed there may have been fewer then ten group sex sessions facilitated by Peggs.* [Doe] believed that she had sex with Peggs alone with no one else present at least fifteen times."[131]

### iii. Meyer's follow-up investigation doesn't substantiate Doe's claims.

Over the next year, Meyer followed up on Doe's allegations, and he would check back in with her to clarify points in her allegations against Peggs, including the commercial-sex acts.[132] And she remembered certain details about the group-sex acts where she was paid, including that it involved Peggs and ████████████.[133] ████████████ was one of the men who she originally mentioned (████████████ ████████████, and he's the one who Doe associates with the J-Group.[134] The J-Group, again, is where everyone put in money for a hotel.[135] When Meyer interviewed ████████ he remembers having group sex with Doe.[136] But he had never heard of Peggs or Jake Thompson and he didn't recognize Peggs's picture.[137] Instead, he remembered having sex with her and another man at an ████████████████████ ████████████.[139] Meyer does not ask him about the J-Group.

---

[131] Bates 505 (emphasis added).
[132] Bates 43838
[133] Bates 508
[134] Transcript of Meyer Interview p. 209
[135] Bates 3792
[136] Bates 43836 - 43837
[137] Bates 43841
[138] Bates 43841
[139] Bates 43841

When Meyer returned to Doe about this, she remembered a new detail: the commercial sex happened with Peggs and a different man named ███████.[140] So Meyer interviewed ████.[141] Like ████████, he admitted to having group sex with Doe, but he didn't recognize the name Dan Peggs or a Jake Thompson.[142] Rather, he said that he met Doe through a man named █████████.[143]

In Meyer's follow-up interviews with both Doe and █████ they report seeing one another in the █████████████████ They became so close that ████████ landlord grew suspicious that she had moved into his residence in ████████.[145] And, again, it's during her relationship ████████ that she posts multiple craigslist ads for prostitution and group sex with ████████ simultaneously.[146] It's likely that ████████ and ████████ encountered Doe from one of her 22 ads looking for group sex.

**H. Doe testifies before the grand jury, giving a single date: November 9, 2015.**

After a year of investigating a human-trafficking charge (carrying a steep mandatory minimum), the commercial sex acts should be clear. But Doe's confusion over the commercial-sex acts continued into the grand jury proceedings. During her testimony, Doe was asked: "how did the hotels happen and like other guys showing up?"

---

[140] Bates 168735
[141] Transcript of ████ Interview
[142] Bates 168782
[143] Bates 168782
[144] Bates 43775 & 43838
[145] Bates 43839
[146] Bates 2940 - 2990

And she responded: "So again, that's something that started happening mainly after I started talking to Dan." Then she gave this description of it all:

> Usually when I would meet up with men in the beginning, it would be meet them in the parking lot, go, come back and be done. Um, and since Dan lived in Eau Claire, he would usually have to get a hotel room for that night. So what would happen with the group sessions is he would get a hotel room. Then I would show up. And then we would find other people to show up, usually as many people as possible. And sometimes during that, at one point I specifically remember there would be people coming in and out you know coming and going. And as they would leave, sometimes they would leave money, um, you know, for the hotel room or something. *And at one point after that he had given me some money, so*

At that, the prosecutor clarified: "so that money was for Jake/Dan?" And Doe answered: yes.[147] And the prosecutor continued: "Did you ever hear him ask for it, or was it just something that was provided?"[148] Doe replied "I don't actually know."  When pressed and asked: "But he got money and he gave you some of it?" she affirmed.[149]  And when asked "[d]id he say anything about what it was for" she responded "'that's just your cut' I guess is probably the terminology he used." After this, Doe testified that this happened at the Microtel in ▮▮▮▮▮▮ on November 9, 2015.[150]

There is no question that Peggs rented a room on that day at the Microtel. If that were the only alleged instance of human trafficking, there would be no need for this motion. We could quickly prepare for trial. The need for a bill of particulars rests in the other dozen to two dozen additional times Peggs allegedly engaged in group-sex with

---

[147] Bates 3538
[148] Bates 3538
[149] Bates 3539
[150] Bates 3539

Doe and somehow received money for it that he gave her. The indictment spans seven months. While it's clear that Doe did engage in group sex and likely did receive some money for sex, most of the group sex (where she likely received some money) lies outside the indictment's time period and doesn't involve Peggs. And the defense is left to guess at when these two dozen instances allegedly took place, the means of trafficking Peggs employed, and what the commercial sex act was involving Peggs. Indeed, the single recorded instance from October 23, clearly involves Peggs getting money to help pay for the hotel room and not a *quid pro quo* for sex. It's worth noting that the one person who could substantiate this all—namely, that these group-sex activities took place and money was exchanged—was Bryan Ragon. He coordinated and watched or listened to almost all of Doe's sexual behavior during this time.

## I. Ragon pleads guilty to transporting a minor across state lines and debriefs with the government.

After his arrest, Ragon pled guilty and debriefed with the government about his relationship with Doe and Peggs. Ragon confirmed he was Doe's "dom," which he described as a "negotiated power exchange."[151] He confirmed that his "sexual fetish was listening in on and viewing sexual acts involving other people."[152] He estimated that he arranged for Doe to have sex "with sixty or so" men.[153] And also only knew Peggs by the name Jake Thompson.[154]

---

[151] Bates 169062
[152] Bates 169063
[153] Bates 169068
[154] Ragon's Proffer Transcript p. 39 & 40

Ragon couldn't recall when he learned that "Jake Thompson" found out about Doe's age; but he was sure it was *after* he learned about it—sometime between "December and February."[155] He also recalled Doe learning Jake Thompson's real name, when she went through his "glove box." When it comes to group sex, Ragon wasn't sure, but he remembered Doe putting her phone in the corner of the room, while she had sex with Peggs so he could listen or watch—he wasn't sure if Peggs was aware that this was happening.[156] He remembered that another individual may have come to the hotel to have sex with her and Peggs, and when Peggs and the other individual left, a third man may have come to the hotel room and had sex with Doe.[157] In the interview, Ragon acknowledged that he would have arranged for the third person, not Peggs.[158]

In total, Ragon recalled two to four meetings with Doe and "Jake Thompson."[159] He could only recall one distinct time where "there was a live feed with Peggs and Doe."[160] When pressed, he couldn't recall anything involving Peggs and money for sex.[161] But he did recall circumstances "in which the individuals [Doe] met offered her money 'or ten bucks' for gas."[162] He recalled that happening "on less than five occasions."[163] But he wasn't too sure.[164]

---

[155] Bates 169068 & 169069
[156] Bates 169069 & 169060
[157] Ragon's Proffer Transcript p. 58
[158] Ragon's Proffer Transcript p. 58
[159] Bates 169070
[160] Bates 169074
[161] Bates 169074
[162] Bates 169074
[163] Bates 169074
[164] Ragon's Proffer Transcript p. 76

There are some points to stress about Ragon's interview and how they bear on this motion. He was recalling details from years ago, events that involved Doe with a lot of men (he put the number near 60) and he didn't remember everything.[165] But he was clear on three important facts. One, Peggs learned Doe's age sometime after he did—December through February.[166] Doe initially puts it at the last meeting, which would have been towards the end of that timeframe.[167] Two, when Peggs was recorded having sex with Doe, it was for Ragon's benefit, not Peggs.[168] And three, Ragon did not recall there ever being any prostitution involving Doe and Peggs. It may have happened with others giving her gas money, but that was it.[169]

### J. The universe of potential dates for Doe to be trafficked is too large and impossible for the defense to prepare for.

The government has turned over every aspect of Peggs's life. His hotel records, his banking records, his school computers, his emails—all of it is contained in the 170,000 pages of discovery we have. In that seven month period, there is little that would support Doe's allegations of for-profit group-sex with Peggs, especially at the number she places it, possibly as high as ten "maybe more" times. It's at those group-sex sessions, that Doe alleges men would give Peggs money for the room that he kept and gave some to Doe. And it's that behavior that would support a human trafficking charge.

---

[165] Ragon's Proffer Transcript p. 39
[166] Bates 169068
[167] Doe / Meyer Interview Transcript p. 140
[168] Bates 169066
[169] Bates 169074

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The questions for the defense and the reason it needs a bill of particulars comes down to: *when* did this take place, *where* did it take place, and *what* did Peggs actually do that constituted human trafficking—e.g., what was the commercial sex act? Was splitting the cost of a hotel room during a group sex-act the commercial transaction? Was, as Ragon put it, some men giving Doe "ten bucks for gas" the commercial transaction? The confusion over that (and the need for a bill of particulars) stems from the defense's inability to decipher from the indictment (and discovery) the *when* and *where* and *what* of this case.

To put it in perspective, here's a quick table of the vacillating numbers of times that Peggs allegedly engaged with Doe in group sex and possibly profited from it.

| Interviewer of Doe | Statement | Poss. No. of Trafficking |
|---|---|---|
| O'Donahue, 12/17/2018 | "The superintendent? Oh at least half of those people." (Doe has alleged 80 total individuals) | 40+ |
| O'Donahue, 12/17/2018 | "I can't remember the exact number for this one, but they would, like, put money on the table. They would just throw down money for the hotel room and I think he kept all of that for the hotel room." | ??? |
| Meyer, DCI 02/06/2019 | "A group, I can only remember maybe once or twice. You're talking over, like, four people. There was a few times with, like, one other person or two other people. Just him, like I said, probably over 15; and then with other people, less than ten." | >10 |
| Meyer, DCI 02/06/2019 | "Maybe ten or more or less with some other people." | ±10 |
| Grand Jury 01/08/2020 | "That is a reservation that Dan made for I guess just, yeah, just the one night, one of the nights we probably used for multiple people." The date for this reservation is 11/09/2015. | 1+ |

In preparing for trial, the occasions that we have to defend against could be forty occasions, it could be ten occasions, it could be less than ten occasions, it could be more than ten occasions. We don't know. Given the breadth of the indictment (almost seven months) and the amorphous allegations of trafficking, the defense needs a bill of particulars. It will allow the defense to establish an alibi for many of these dates, and it will allow the defense to understand the precise allegations it must combat at trial—allowing it to prepare for trial and avoid unwarranted surprise.

## II. In order to prepare for trial, the defense needs a bill of particulars.

This Court has broad discretion under Federal Rule of Criminal Procedure 7(f) to order the Government to provide a bill of particulars. See Fed. R. Crim. P. 7(f). A bill of particulars "serves to supply the evidentiary details needed to prepare a defense." *United States v. Am. Waste Fibers Co.*, 809 F.2d 1044, 1047 (4th Cir. 1987); *see also United States v. Doe*, 481 F.2d 685, 690 (4th Cir. 1973) (stating that the function of a bill of particulars is "to supply any essential detail which may have been omitted from the indictment"); *United States v Canino*, 949 F.2d 928, 949 (7th Cir. 1991). "Although an indictment should allege facts sufficient to put the defendant on notice of the charges against him so that he may prepare his defense, a bill of particulars or discovery often may be used if sufficient facts are not alleged." *United States v. Previti*, 644 F.2d 318, 319 (4th Cir. 1981); *see also United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) ("Our bill-of-particulars analysis is similar to our constitutional sufficiency-of-the-indictment analysis; in both cases, the key question is whether the defendant was sufficiently apprised of the charges against him

in order to enable adequate trial preparation."). A bill of particulars thus "amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996); *see also Blanchard*, 542 F.3d at 1140.

Here, there are three points that the defense needs spelled out in a bill of particulars. First, when these human trafficking crimes took place. Currently, the government alleges between October 2015 and May 2016. This is not a case where Peggs acted as Doe's "pimp," where she was under his control that entire time, during which he forced her to engage in prostitution. Rather, they had a sexual relationship that started in October and ended in February. They stopped talking after he learned she was a minor, and it sporadically resumed after she was of age. Within that time, she engaged in repeated commercial sex acts with people other than Peggs. Lots of men clearly paid her for sex, and it's possible that some (who she didn't "charge") gave her "gas money" after sex—Ragon confirms this. But that wasn't Peggs. And it can't be that Peggs has to claim an alibi for seven months, accounting for his whereabouts whenever it could have been that Doe's group sex ended with an exchange of money. The defense has the right to know when these events allegedly took place; it is the only way that it can "prepare for trial." *See Canino*, 949 F.2d at 949 ("The standard is whether the government's indictment sufficiently apprises the defendant of the charges to enable him to prepare for trial.").

Second, the defense needs to know the means of trafficking. The indictment mirrors the statute, providing every possible means that Peggs could have trafficked Doe.

But this is not a normal human trafficking case. Peggs didn't recruit, entice, transport, or maintain Doe. And by her own admission, he did not patronize her. The defense cannot prepare a defense based on a scattering of allegations. *See United States v. Hallock*, 941 F.2d 36, 40 (1st Cir. 1991) ("The indictment failed to specify the name of the victim, the means of the alleged extortion, or the precise location…the three omissions, taken together, made it difficult for the defendant to determine exactly what conduct of his had given rise to a charge of extortion."); *see also United States v. Kay*, 359 F.3d 738, 756-57 (5th Cir. 2004) (concluding that greater specificity is required where the element is stated in generic terms, the underlying facts go to the core of criminality, and there are innumerable ways of meeting that core requirement). We are talking about a great deal of labor at trial to unpack the allegations and prepare a case on what's really at issue. Indeed, given the contrast between the Indictment and discovery, there is no way to ascertain (absent a bill of particulars) what will be at issue in the trial. *See United States v. Hedman*, 458 F. Supp. 1384, 1386 (N.D. Ill. 1978) ("[R]equiring a defendant to develop alternative defenses to the three alternative theories that the Government might proceed upon would result in the expenditure of a great deal of unnecessary labor, and even possibly impair an adequate preparation of a defense…On the other hand, the Government's case will not be unduly prejudiced by disclosing the particular theory which it intends to use at trial.").

Third, there is a fine line between a commercial sex act and giving someone gas money or cab fare. If Peggs is supposed to stand trial for receiving money for a hotel that

they all used to have sex in, then the defense needs to know. There are problems with a steep mandatory minimum (fifteen years) being imposed for such behavior. And criminalizing that would potentially invade the State's police power. Not only that, Peggs has the right to know if the criminal action is splitting a hotel room with others who also had sex with Doe. It's not enough to throw it all in and hope the jury sorts it out.

With those three points in mind and those specific requests for a bill of particulars, it's important to remember:  the purpose of a bill of particulars "is to fairly apprise the defendant of the charges against him so that he may adequately prepare a defense and avoid surprise at trial." *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012). Where there is doubt, it "must be resolved in favor of disclosure and the conflicting concerns must yield to paramount public interest in affording the accused a reasonable foundation for mounting a defense." *United States v. Manetti*, 323 F. Supp. 683, 696 (D. Del. 1971); *see also United States v. Rogers*, 617 F. Supp. 1024, 1027-8 (D. Colo. 1985).

It is no "'answer to a motion for a bill of particulars for the government to say: The defendant knows what he did, and, therefore, has all the information necessary.'" *United States v. Doe*, 254 F. Supp. 177, 181 (W.D. Ark. 1966) (quoting *United States v. Smith*, 16 F.R.D. 372, 375 (W.D. Mo. 1954)). Such an "argument could be valid only if the defendant [were] presumed to be guilty" since "only if he is presumed guilty could he know the facts and details of the crime." *Id.* In our justice system, however, the accused "is presumed to be innocent," which means "it must be assumed 'that he is ignorant of the

facts on which the pleader founds his charges.'" *Id.*; *see generally* 1 Charles Alan Wright et al., Federal Practice and Procedure § 130 (same).

The dangers of denying a defendant sufficient information to prepare a defense and avoid unfair surprise are particularly serious in Peggs's case, given the difficulties with discovery and its sheer utterly overwhelming volume. *See United States v. Allen*, 289 F. Supp. 2d 230, 237 (N.D.N.Y. 2003) ("In determining whether a bill of particulars is warranted, the court should consider the complexity of the offense, the clarity of the indictment, and the degree of discovery otherwise available to the defendants."). As one court observed: "Perhaps the most frequent case in which particulars are warranted is where discovery is overwhelmingly extensive and the government fails to designate which documents it intends to introduce and which documents are merely relevant to the defense." *United States v. Mahaffy*, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) (emphasis omitted). That makes sense, of course, since a defendant and his attorney should not have to spend months (or in this case well over a year) combing through hundreds of thousands of pages (within thousands of documents and spreadsheets and reports) in order to understand the charges against him and see what else could be lurking out there. *See United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) (noting that the "district court made clear that it ordered a bill of particulars because so much discovery was produced to the defendants, not too little"). That is the case here. It's easy to be both overwhelmed and lost in the case's discovery. A bill of particulars will, thankfully, cure this and focus the defense's energies. *See Mahaffy*, 446 F. Supp. 2d at 120 ("[A] large volume of discovery

warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial."). It will streamline the trial and focus everyone's energies upon what is at issue.

## III. Conclusion

This is a monster case. The defense has done its best to distill it down to the narrative that seems to be consistent with the discovery, but we can't be sure. There's simply too much discovery, too broad a period, and far too few concrete details to establish when this human trafficking was supposed to happen, how it happened, and what precise actions Peggs is supposed to have taken to violate the statute. It's a rare case in this district where a bill of particulars is needed, but this case, with it's mountain of discovery and broad allegations, is the type Rule 7 was designed for. The trial preparation and the trial itself will be streamlined if the Court grants the motion and orders the government to provide the defense the following:

1. The alleged dates that Peggs trafficked Doe;

2. The alleged means of this trafficking; and

3. What actions amounted to a commercial transaction.

Dated at Madison, Wisconsin, this 25th day of June, 2021.

Respectfully submitted,

Daniel Peggs, Defendant

*/s/Joseph A. Bugni*
Joseph A. Bugni

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
Joseph_bugni@fd.org