UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

       Plaintiff,

 -vs-                           Case No. 20-CR-20-JDP

DANIEL PEGGS,                   Madison, Wisconsin
                                     December 2, 2021
        Defendant.             1:01 p.m.

_____

STENOGRAPHIC TRANSCRIPT OF SENTENCING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                  Office of the United States Attorney
                  BY:   JULIE S. PFLUGER
                  Assistant United States Attorney
                  222 West Washington Avenue, Suite 700
                  Madison, Wisconsin  53703

For the Defendant:

                  Federal Defender Services of Wisconsin
                  BY:   JOSEPH A. BUGNI
                  22 East Mifflin Street, Suite 1000
                  Madison, Wisconsin  53703

Also appearing:   DANIEL PEGGS, Defendant
                  MARIAH STIEVE, U.S. Probation Officer
                  SHAVON CAYGILL, Paralegal

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
 1              (Proceedings called to order at 1:01 p.m.)

 2              THE CLERK:  Case No. 20-CR-20-JDP-1, the United States

 3    of America v. Daniel Peggs.  Court is called for a sentencing.

 4         May we have the appearances, please.

 5              MS. PFLUGER:  Julie Pfluger on behalf of the United

 6    States.  Good afternoon, Your Honor.

 7              THE COURT:  Good afternoon.

 8              MR. BUGNI:  Good afternoon, Your Honor.  Joe Bugni and

 9    Shavon Caygill from Federal Defender Services appearing on

10    behalf of Mr. Peggs.

11              THE COURT:  Good afternoon to all of you.

12         All right.  I see there's a lot of people in the courtroom.

13    Anytime a public figure commits a crime, it's bound to generate

14    a lot of interest among the public, and I'm happy to have you

15    here in the courtroom.  What we do in federal court is public,

16    and you're welcome to observe.  Of course, I'm sure you

17    understand it's a somber proceeding, so there shouldn't be any

18    outbursts or commentary.  You're here to listen.  If anybody

19    creates a ruckus, I'll ask that you be removed.  I'm sure that

20    won't happen.

21         I think it might be appropriate for me to start by making a

22    couple of preliminary comments.  I have read every one of the

23    letters that have been sent to me, and I think there are over a

24    hundred of them.  A couple of points emerged from those letters

25    that I think warrant clarification at this point.
```

1          First of all, let me talk about the grand jury and the

2    indictment.  The Constitution of the United States requires the

3    government to present its case to a grand jury and requires that

4    the government secure an indictment before an individual can be

5    prosecuted.  That prevents the government from prosecuting

6    somebody on the basis of a trumped-up charge that doesn't really

7    have any evidence to support it.  It's an important part of the

8    process, but it doesn't establish the defendant's guilt to have

9    an indictment issued.  In fact, the instructions that I would

10   read to the jury that would hear the case if it goes to trial

11   include a very specific instruction that the indictment doesn't

12   even create a suspicion of guilt.  And so many commenters in the

13   letters expressed surprise that there was a plea agreement here

14   that ended up dismissing some of the charges in the indictment.

15   Well, the indictment is just the way of getting the case going.

16   It doesn't establish guilt or even raise a suspicion of guilt.

17          Now, it's also true that in our federal sentencing system I

18   am able to -- in fact, I'm required to look more broadly at the

19   defendant's criminal conduct more than just the charge that's

20   articulated in the information or in the plea agreement.  So I

21   can look more broadly at the criminal conduct here, and I'm not

22   restricted just to the possession of child pornography.  So just

23   because there was a plea agreement that resulted in conviction

24   on only one count doesn't mean that I don't look more broadly at

25   the conduct here in this case.

1        Now, about the plea agreement itself.  There are many

2    people who were upset by the plea agreement and suggested that I

3    shouldn't accept it.  Well, as the judge, I have very limited

4    authority to reject the plea agreement because fundamentally the

5    decision about what charges to pursue are for the U.S. Attorney

6    to decide.  So it's not really up to me to decide what charges

7    are pursued, so that's not a question for me.  As I said, I

8    still get to look more broadly at the criminal conduct, so it's

9    not like the other conduct doesn't matter.  And I'll also make

10   this observation, and that is that I don't see anything

11   inappropriate about the plea agreement.  I don't think that it

12   diminishes this case at all, and I think the fullness of the

13   sentencing hearing will bear that out.

14       So with those preliminary comments about how we got here,

15   I'll then turn to what we're going to do today.  The first thing

16   that we are likely to do is to analyze the guidelines.  The

17   federal sentencing system has a set of guidelines that recommend

18   a certain kind of sentence.  Those guidelines are advisory.  I

19   have to consider them, but I don't have to follow them strictly,

20   but I am obligated to begin by correctly calculating what those

21   guidelines are.  It will seem like kind of a technical exercise,

22   I think, but it's an important part of the process that we'll

23   have to work through.  After that I'll hear arguments of counsel

24   and any other evidence they expect to present to me, and we'll

25   have a little bit of a back-and-forth between me and counsel,

1    and the defendant will have the opportunity to speak, and then I

2    will probably take a recess after I have all that information

3    before me, and all the information that I have already, I'll

4    take a recess and deliberate on the sentence a little bit.  Then

5    I'll come back and announce what the sentence will be.  So

6    that's our agenda for the day and some background of what we are

7    about to do.

8        Let me begin, as I always do, by highlighting or going

9    through an inventory of the materials I've reviewed to make sure

10    that I didn't miss anything.  And before I do that, I'll note

11    that Mariah Stieve is in the courtroom with us.  She's the

12    probation officer who prepared the presentence report and the

13    revised versions of it as well.

14        So I begin with the presentence report, which exists really

15    in three versions.  I've got the original and two revised

16    versions.  I've got the addenda to the presentence report, which

17    explains the revisions that were made and the response to the

18    objections from Ms. Stieve and the probation office.  I have the

19    defendant's objections and the government's objections.  I'll

20    cite the docket numbers.  I think I've covered them all, but

21    from the defendant I have docket 113, 125, 126, 152, 161.  I

22    have the government's objections in docket 112, 123, 127.  And

23    then I have sentencing memoranda from the government and from

24    the defense, really two of them from each, and then I have the

25    defendant's written allocution.  As I said, I have letters from

1    many people.  I have the letter from the former Mrs. Peggs, I

2    have the letter from the victim, and then I also have -- I

3    should say the letter from the victim's mother, and then I have

4    the many letters from members of the public who wrote to me.

5    And I also have a set of letters that were written on behalf of

6    Mr. Peggs.  So let me thank all of you who took the time to

7    write to me and give me that input.  I appreciate having that.

8        I don't know if there's anything that I have missed in the

9    inventory.  I think I have looked at everything at least once,

10    sometimes more than once, but let's find out if there's anything

11    that the government thinks I have missed.

12        MS. PFLUGER:  I didn't hear you mention -- it was

13    docket 170.  It was an exhibit that I filed.

14        THE COURT:  That was among the late-breaking things

15    this morning, and then you offered a correction in your

16    paraphrasing.

17        MS. PFLUGER:  That was yesterday, yeah.

18        THE COURT:  I did see that, yes.

19    Mr. Bugni?

20        MR. BUGNI:  I also filed one late last night.

21        THE COURT:  I didn't see it.  I'm sorry.  I did go to

22    sleep, and I didn't see it until this morning.  So my apologies

23    for sleeping on the job, but I did see it this morning.  All

24    right.  I think that covers everything.

25        All right.  Mr. Peggs, I have many objections that have

1    been communicated to me.  We will address them, but let me ask

2    are there any other concerns you have about the presentence

3    report that have not been communicated to me?

4              THE DEFENDANT:  I don't believe so, Your Honor.

5              THE COURT:  All right.  Very good.  All right.  So let

6    me -- I've got a couple of issues with the presentence report

7    that I know I will have to address, so let me just run down my

8    inventory.  I have a couple of rulings that affect the guideline

9    that we'll have to address, but let me just start with some

10   clarifications that I know I will have to make.

11        I believe the parties stipulated that there should be an

12   amendment to paragraph 29 in the presentence report and that

13   there were two additional hotel receipts for the AmeriVu in Rice

14   Lake on October 30th, 2015, and November 30th, 2015, and I don't

15   think we managed to pick those up in the second revised

16   presentence report.

17        The phrase "as a principal" was -- I had a request from the

18   defense to delete the phrase "as a principal" from paragraph 28.

19   I will grant that request, and I will have the phrase "as a

20   principal" deleted.

21        I will note then that Ms. Stieve and I discussed the

22   objections to paragraph 49 and 50 that relate to the child

23   pornography that was found on the hard drive that contained all

24   the music files, and I believe the parties are in agreement that

25   there is not evidence that those were knowingly possessed, that

1   they were residual from some earlier phase of the -- on that

2   hard drive, and so I have -- I don't want to delete the entire

3   reference to that because that is the factual basis for the --

4   Count 4 in the indictment, so I just want to have an explanation

5   for where that came from, but I agree that we will delete the

6   descriptions of the videos because the actual content of the

7   videos is no longer a reference.  So paragraph 49 will be

8   amended to delete the description of the videos.  Paragraph 50

9   will be amended to delete the paraphrase or description of

10  videos as well.

11       I think paragraph 51, the defense has asked for a finding

12  that the defendant did not access the victim's high school

13  records.  I think there is a comment already in there.

14       Is that adequate to address your concern?

15       MR. BUGNI:  I mean, there's a difference between us

16  denying it and the case agent actually went and looked and was

17  able to substantiate that he never looked at it.  So I'd prefer

18  that you just take it all out, but I'm not looking to wordsmith

19  today.

20       THE COURT:  The reason I didn't want to take it out is

21  I think it is an accurate paraphrase of a statement of the

22  victim.  It actually is -- the statement itself is ambiguous as

23  to whether there actually was a searching of the school records.

24  It says "looked up the school records" or something like that,

25  and so I do -- I am willing to make the finding that there is no

1    evidence that the defendant was able to look up her school

2    records, so I'm comfortable with that.  So we'll amend that

3    comment to reflect that.

4         I think that covers the factual clarifications that need to

5    be made from the second amended presentence report.  We still

6    have the -- and, of course, the guidelines are affected by the

7    removal of the music hard drive child pornography, so I'm

8    sustaining that objection to the guideline calculation.  So the

9    four levels for that pornography is removed from the guideline

10   calculation.

11        That just leaves the guideline issue related to the

12   application of the cross-reference, which we'll get to in a

13   moment.  But first I want to make sure that all the factual

14   clarifications have been adequately reflected in the presentence

15   report with my additions here this afternoon.

16        Ms. Pfluger, is the government satisfied with the factual

17   corrections?

18             MS. PFLUGER:  Yes, Your Honor.

19             THE COURT:  Mr. Bugni?

20             MR. BUGNI:  Yes, Your Honor, with just one caveat.  I

21   had filed in 161, the omnibus, kind of synthesizing everything

22   so --

23             THE COURT:  Yes.

24             MR. BUGNI:  I just want to make sure -- I take it from

25   the fact that you went through so thoroughly that you

```
 1    actually -- you read both sides, so you see, like -- I'm not
 2    going to ask you to wordsmith.  You saw, like, here is our
 3    evidence, and you understand that there's another side to many
 4    of these allegations.
 5          THE COURT:  Yes.  And so I went through, and I picked
 6    up the ones that I felt that you were really asking for a ruling
 7    on, and I addressed those this morning.  The other ones I went
 8    back and reviewed them and looked at both sides' stories, and so
 9    I understand your position.
10          MR. BUGNI:  Thank you.  I just wanted to --
11          THE COURT:  But I want to make sure that the document
12    is good.
13          MR. BUGNI:  The document is good.
14          THE COURT:  All right.  Then let's discuss the
15    cross-reference.  I got a lot of submissions on the application
16    of the cross-reference.  I don't know that I need to hear
17    anything more, but I'll give you a last chance.  It has a
18    dramatic impact on the guidelines.  So is there -- could there
19    be anything else to say about the application of the
20    cross-reference?
21        Mr. Bugni, it's your objection, so I'll start with you.
22          MR. BUGNI:  Your Honor, when you look at the word
23    "caused" and "for the purpose," those are the twin demands of
24    the cross-reference, and here the causing is not done by Peggs.
25    Peggs is not, like, an indispensable force.  If it's not for
```

1    him, it will be the other people in the room.  It's being caused

2    by Ragon.  But also there's a deeper level of "for the purpose,"

3    and as I tried to come up with what is the better example, if it

4    were Ragon said, you know, "Peggs, I need you to wear a pink

5    headband to have sex with KV1," or, "I need you to take her out

6    to dinner," you wouldn't say that he took her out to dinner for

7    the purpose of engaging in sexually explicit conduct or --

8    sorry, he didn't engage in sexually explicit conduct for the

9    purpose of taking her out to dinner or he didn't wear a pink

10    headband for the purpose of, you know, doing that.  It's that

11    it's ancillary to it, and this does have a huge effect on the

12    guidelines and where it starts.  I know the Court can discount

13    and 3553(a), but it does go to the core of this, was that his

14    purpose in doing this.

15        And I cite to case law that it has to be a dominant

16    purpose.  It's not just like the smallest purpose that, yeah, he

17    did hold a camera, he did communicate about that.  We all agree

18    on those facts.  It's whether or not he walked into that sexual

19    encounter and said, you know, "I'm doing it so I can videotape,"

20    or is he saying, "I'll videotape so I can have sex with you."

21    That's a big difference, and to the extent --

22            THE COURT:  I understand.

23            MR. BUGNI:  Sorry.

24            THE COURT:  I just said I understand the distinction,

25    yes.

```
 1              MR. BUGNI:  And to the extent that that is there, Your
 2     Honor, and there's any ambiguity as to what his purpose was in
 3     that, not only with the cause but with the purpose, then, Your
 4     Honor, it's not an applicable guideline reference.  It just
 5     doesn't capture the heart of what we're trying to get when we
 6     look at people who produce child pornography.
 7              THE COURT:  Ms. Pfluger?
 8              MS. PFLUGER:  I believe my sentencing memo adequately
 9     addresses it, but I would like to point out that "cause" isn't
10     the only verb.  It's also permit -- the defendant permitted the
11     minor to engage in sexually explicit conduct -- he transported
12     her, and he caused her.  Yes, Ragon also caused her, but there
13     can be more than one person who causes, and while he didn't walk
14     in with the purpose to produce a visual depiction, to videotape
15     it, he certainly jumped in full force.  He was all in favor of
16     this, and as the evidence showed, he was a participant in it.
17     There was no, as the defense puts it, you know, he had to in
18     order to have sex with her.  He didn't have to do anything.
19     Ragon wasn't in the room, and he was communicating directly with
20     the victim.  He could arrange things directly with her.  He
21     could have caught Ragon out, but he didn't because he enjoyed
22     it, and it was one of his purposes.  And we'll get more into
23     this I'm sure with the argument but --
24              THE COURT:  Yes.  Honestly, I don't even think this one
25     is a close call.  I think that this is -- if I look at the facts
```

1    here, that what we have is we have Mr. Peggs coordinating

2    explicitly with Mr. Ragon, who I agree is definitely a cause of

3    the sexual activity and for the purpose of making the video, but

4    he is not the only one.  Mr. Peggs cooperated and followed

5    Mr. Ragon's instructions but eagerly embraced it, communicated

6    that he liked being behind the camera.  He set up the sexual

7    encounters with other men.  And I take your point that maybe his

8    primary interest was really in having sex with the victim, but

9    pornographers often do what they do partly because they enjoy

10   having sex with the victim, but this was so consciously and

11   premeditatedly established to be live streamed to Mr. Ragon that

12   I think this is not even a close call that the cross-reference

13   applies here.  And I think particularly in light of the fact

14   that Mr. Peggs actually made some of the recordings, albeit

15   using the victim's cell phone, I think just really takes this

16   really beyond the realm of reasonable debate.  I think the

17   cross-reference plainly applies here, so that objection is

18   overruled.

19        I think with that then, I think we are, in light of my

20   ruling anyway, I think we are in alignment on the guidelines.

21   So let me just confirm that in light of my ruling then, we are

22   in agreement that the guideline will be a total offense level of

23   33 with a criminal history category of I, which would mean that

24   the guideline imprisonment range would be 135 to 168 months.

25   However, in light of the statutory maximum term of ten years,

1     that becomes the guideline, 120 months.

2           Ms. Pfluger, are you in agreement with that?

3                MS. PFLUGER:  Yes.

4                THE COURT:  Mr. Bugni?

5                MR. BUGNI:  Yes, Your Honor.

6                THE COURT:  Okay.  That's where we take it.  Also, for

7     purposes of comparison and analysis, I commonly in child

8     pornography cases depart downward for two levels because there's

9     an enhancement for use of the computer.  I'm open to input on

10    whether I should consider that here because in child pornography

11    offenses in this day and age, it's almost inevitable that a

12    computer is used so that that enhancement isn't really

13    appropriate because it's basically part of the offense.  This

14    situation is a little different, so I'm not sure that that

15    departure would be warranted.  If I did apply it, the offense

16    level would be 31, and the guideline range would be 108 to 135

17    months, just for a point of comparison.  I'll take input during

18    argument about whether I should follow my usual approach in this

19    case.  So that's where the guidelines take us.  So the

20    guidelines are, strictly calculated and applied, at the

21    statutory maximum of 120 months.

22          And with that, we can turn to the argument.  Ms. Pfluger?

23                MS. PFLUGER:  Yes, Your Honor.  I just had a matter to

24    bring up.  I don't know if there's any press here, and I also

25    know this is being streamed to another room.

1          THE COURT:  Yes.

2          MS. PFLUGER:  The victim is here.  She is planning on

3    making a statement.  She requests that her name not be used at

4    all.  She also requests, and I don't know if there's any sketch

5    artist, but that a sketch of her not be made.  She --

6          THE COURT:  I think I see the sketch artist, and I know

7    that I see press in the room too.  So I will ask the press not

8    to reveal the victim's name, and I will ask the sketch artist to

9    not depict her so that you could see her face.  Okay?

10          MS. PFLUGER:  Thank you.

11          THE COURT:  All right.

12          MS. PFLUGER:  And the victim would like to make a

13    statement after we've finished argument.

14          THE COURT:  I will let you decide when the victim can

15    talk.

16          MS. PFLUGER:  Okay.  Thank you.

17      As my sentencing memo described, the defense and the

18    government have vastly different views of this case.  The

19    defense would make this about a cheating husband, and if that's

20    what it was about, we wouldn't be here.  I'm sure that's why his

21    ex-wife is really mad.  I'm sure that's why some people in the

22    town are really mad, but that is not why the government

23    prosecuted him.  That is not a crime.

24      And the defense's sentencing memo really detailed the

25    trauma the victim had suffered, which, by the way, the victim

1    has asked now, and I don't know if it's possible, if both the --

2    if the defense's sentencing memo -- and if it happens for

3    defense, I think it should happen for prosecution too -- if that

4    could be sealed because it details so much of her life that

5    isn't even necessarily accurate but it's very disturbing for

6    her, so that we can talk about sealing those perhaps?

7        THE COURT:  Okay.  I'd be willing to entertain that at

8    least.  I'd hear from both sides on it, but yes.

9        MS. PFLUGER:  Okay.  But it's not about any trauma she

10   suffered before she met Bryan Ragon or Dan Peggs.  Yes, she was

11   vulnerable, and no one disputes that, and that made her an easy

12   target, but to call her a prostitute?  She was -- you know, in

13   the time before she met Dan Peggs and Bryan Ragon, she was 14,

14   15, and 16.  There is no such thing as a 14-year-old prostitute.

15   There's a victim who is being trafficked by an older man, which

16   is what happened to her.  She was a child.  And the defense

17   points out, you know, she started making videos before she met

18   him.  She was being exploited before she met him, and that

19   continued.  What happened after she, you know, she met Dan Peggs

20   and Bryan Ragon also isn't particularly relevant, so I'm going

21   to focus on what happened during the time she knew Dan Peggs.

22   And like I said, the only reason her past is relevant is because

23   it shows how vulnerable she was, and Dan Peggs, a man trained in

24   child development, a man who was on his way to get his Ph.D. and

25   was trusted with protecting children, he knew that, he saw that,

1    and he furthered the exploitation.

2         The sentencing memo talks a lot about what Dan Peggs didn't

3    do, and as the Court pointed out, rightly so, we are no longer

4    pursuing the possession of child pornography on the hard drive

5    that was found.  We just -- after looking at it, it became

6    pretty apparent he got that from someone else, and he likely

7    didn't know the child pornography was on there.  But what he did

8    do, if -- the defense's sentencing memo goes through three

9    different things that it claims, and so I'm going to kind of

10   talk about each of those.

11        And the first is he says Dan Peggs did not traffic Jane

12   Doe.  He admits that Bryan Ragon did.  He says Bryan Ragon is a

13   trafficker, but he says that the government no longer contends

14   that trafficking happened.  That's not correct at all.  While we

15   didn't pursue that charge to trial, we do not concede that that

16   didn't happen.  It did happen, and the evidence shows it.  But

17   the Court has seen enough human trafficking trials here to know

18   this is not a typical trial, right, that you would see a lot of

19   victims and the kind of physical abuse that happens.  That

20   didn't happen here, but trafficking happened.  Dan Peggs

21   solicited men to have sex with a minor, and he took the money.

22   And whether it happened once or multiple times isn't clear, but

23   it doesn't matter.  We know it happened once.  Him and Bryan

24   Ragon coordinated to find men to come to a hotel room to have

25   group sex with the victim, and he took money.  But even if there

1    was no money taken by Dan Peggs, the benefit, which is required

2    in trafficking, you get a benefit, is the sexual satisfaction he

3    was getting.  At the very least, he was aiding and abetting the

4    trafficking by Bryan Ragon, but we can show he did traffic her.

5         As Exhibit A shows that I filed yesterday, there's a chat

6    between Bryan Ragon and Dan Peggs directly, because they have

7    now caught out the victim, and Dan Peggs says, "I'll get the

8    room."  And then on October 28th, 2015, at 10:46 a.m. he said to

9    Bryan Ragon, "Can you please see if any of the other guys can

10   pitch in for the hotel room?  I'll book it."  He's asking for

11   money, and that satisfies the element of sex trafficking.  And

12   then there's a video that was referenced in my sentencing memo

13   where you see the guy leave money, and at first the victim

14   thinks it's for her, and, you know, she talks to Ragon like,

15   "Wow.  This guy left money," but then Peggs knocks and comes

16   back in and said, "Hey, forgot my money."  That's sex

17   trafficking.  The government does not concede that she was not

18   trafficked.  We did not pursue that to trial.

19        And, again, the claim that, you know, Dan Peggs told her

20   not to prostitute, that may be true, but that doesn't mean he

21   didn't traffic her.  Often traffickers tell their victims, "You

22   shouldn't accept money for this," because they want the benefit,

23   whatever that benefit is.  It doesn't matter if he discouraged

24   prostitution.  It doesn't matter if he didn't know the federal

25   definition of sex trafficking so he didn't think he trafficked

1       her.  It doesn't even matter if she knew and she didn't think

2       she was trafficked.  The elements are satisfied, so the

3       government strongly contests the defense's first statement that

4       Peggs didn't traffic Doe.

5            The second point that the defense says is that Dan Peggs

6       didn't know Jane Doe's age until February 12th, 2015, and he

7       says it was on that date at the Wisconsin Dells at a hotel room.

8       He was at some kind of educational training seminar that he had

9       invited her to.  And the defense says in their sentencing memo

10      this is just a "he said, she said" and you have to either just

11      trust her or trust him.  That's not correct.  First of all, he

12      met her through a Craigslist ad, okay, that said something to

13      the effect of "younger slut" that said she was -- if any age, it

14      said 18 or 19.  She looked very young, okay?  So this isn't

15      going to that he didn't know, but he should have known.  You saw

16      pictures of her, and you also saw the many men who commented

17      when they walked in the room -- we have it on video -- "Are you

18      in high school?  Your posting says you're 18.  Are you sure?"

19      Because it's very obvious by looking at her she's a minor.

20           And -- so Dan Peggs met her, and on October 30th, 2015, he

21      tells her he thinks she's a minor.  You see him in a hotel room

22      with her.  He walks out, and the victim says to Bryan Ragon,

23      "Hey, he's accusing me of being under 18."  Okay.  So he didn't

24      know, but he strongly suspected.  And Ragon responds, "Well, I

25      didn't tell anybody about your age," not those exact words but

something to that effect.  But that wasn't enough.  Even though
he suspected, he kept having sex with her.  And she did say she
was 19, and she did digitally alter her ID.  She never possessed
a fake ID she showed people.  She did digitally alter her fake
ID, which, as you saw, there were men that even questioned that
saying, "Not sure about that."  But she also consistently said
she told him, and she has never faltered on this, she told him
she was a minor.  She doesn't know the date.  You know, this
was, by the time she reported, five years later, but what she
does know and what she never falters on is she told him, and
they continued -- he continued to sexually exploit her, and she
was a minor.  Okay?

The sentencing memo says that, well, Ragon learned that she
was a minor in December 2015.  That's incorrect.  At the very
latest there's a conversation November 20th, 2015, where Ragon
is talking to Jane Doe about, "Hey, this guy found your high
school yearbook.  What should we do?"  But even in this
conversation on October 30th, you know, where Peggs has stepped
out of the room, he's saying, "I didn't tell anybody about your
age."  So when he learned exactly, at the very latest November
20th.  It's not as the defense claimed he learned in December.

And defense talks a lot about Ragon's proffer and how this
supports his version of the case.  Actually, what Ragon said is
that Jane Doe told him on the second date, "Hey, he knows my
age.  He looked me up in his school system."  Look, whether he

1      looked her up in the school system or not, I don't know, but

2      what I do know is Ragon says she says he knows my age on the

3      second date.  Date, bad word.  Second encounter.

4           There's also some hinting that perhaps she's older than she

5      really is because she's adopted.  Look, this is -- I don't

6      know how to -- look, she is what she is.  Here's when she has

7      her driver's license.  Here's when she can vote.  Here's when

8      she can buy alcohol.  That's her age.  I mean, I looked at her

9      adoption record.  No one is going to say she's -- no one can

10     prove she's a different age than what her American birth

11     certificate and documents say.

12          And the thing here is that Jane Doe, she doesn't have a

13     reason here to make up that she told him her age.  She's not out

14     to get him.  You saw in defense's sentencing memo and in the

15     discovery she considered him a friend.  This was her mentor, her

16     confidant.  She has nothing to gain by saying she told him her

17     age, and Bryan Ragon has nothing to gain by saying, "Hey, she

18     told me."  And it's not, like the defense puts in their

19     sentencing memo, she drops this bombshell and then she keeps

20     dropping it again and, you know, try to say she's not credible.

21     It wasn't a bombshell to him.  He suspected it right on.  He

22     said, "Hey, I think you're" -- we don't see him saying it, but

23     you see her saying, "He thinks I'm under 18."  It's not

24     bombshell after bombshell.  What she says is, "You know I'm the

25     age of your students," and she consistently reports this.  She

1    doesn't know when she said it.  She remembers a time at the

2    AmeriVu, which was very early on, where they had a conversation.

3    She says to him -- she reports she says to him, "I'm literally

4    in high school right now," and he says, "Well, I'm literally a

5    principal in high school right now."  Defense points to a chat

6    and says that's not what the chat says.  That's not what she's

7    referring to.  He's saying this chat is her telling him she's a

8    minor.  That's not what she's referring to.

9          THE COURT:  She's referring to another conversation?

10         MS. PFLUGER:  Yes.

11         THE COURT:  The chat is a little ambiguous.

12         MS. PFLUGER:  Yeah, yeah.  The chat is ambiguous.

13    Look, we -- here's the thing about this case, like, we have what

14    we have.  We showed you, right?  We don't have a lot, all right?

15    We didn't get any of his electronics.  From her electronics, we

16    got a lot of things from deleted space or she had to, like, try

17    to recover things, and then after Jane Doe stopped, for the most

18    part, stopped communicating with Bryan Ragon in January, we have

19    nothing because most of what we had was recovered from Ragon's

20    information.  So when she cuts him out and it's just Peggs and

21    her, we have what she says, but what she says is consistent and

22    corroborated.

23       She -- the defense says in their sentencing memo that she

24    says, oh, yeah, she told him at a casino, and that's the big

25    thing in February.  That's not what she said.  What she said was

1   when they went to the casino, she said, "Hey, I can't get in

2   here," and he said, "Be quiet.  Don't worry about it."  She

3   didn't say, "That was the one and only time I told him my age,"

4   and she never said, like, "I told him repeatedly, 'Hey, I'm 17.

5   Hey, I'm 17.'"  She said there were several instances.  It

6   wasn't this huge bombshell, like, "Hey, guess what?  I'm 17."

7   It just would come up in conversation, like, "Hey, you know

8   I'm -- hey, I'm the same age as your students."  So it wasn't

9   like bombshell after bombshell.  It was just course of their

10  relationship.  Do I know the date?  No.  But the victim has

11  consistently said after she told him, the exploitation

12  continued.

13      The third thing that defense claims is that Peggs didn't

14  have any interest in producing images and that Ragon was the

15  driving force between -- behind recording.  Well, Ragon was a

16  force, but so was Dan Peggs, right?  Dan Peggs didn't walk in to

17  meet her and say, "I want to record this."  What he did, and you

18  saw the transcript -- or the summary of the video, you see him

19  walk into the hotel room the very first time he meets her.  She

20  says, "I have something I have to tell you."

21      "What?"

22      "Well, there's this guy on the phone, and you've been

23  communicating with him, not me, and he's watching."

24      And his response was, "That's awesome."  Like -- I can look

25  at the exact words, but it was --

1          THE COURT:  I think that was the phrase as it was

2     transcribed.

3          MS. PFLUGER:  I think it's, "That's awesome," right?

4     It wasn't like, "Oh, my gosh.  Wait.  Someone's watching?

5     There's a video?"  It was, "That's awesome."

6          But even before then, you know, Peggs -- he says he was

7     forced to take these pictures.  He didn't want to.  He just

8     wanted to have sex with the minor.  He didn't want to take the

9     pictures.  There's texts from before the minor even meets him

10    where Ragon says, "Jake demanded you go to the bathroom and take

11    a picture of your fine ass pants down because he needed to get

12    hard again."  She says she can't because her phone is broke, and

13    Ragon communicates, "Jake really wants it."  This is before she

14    even meets him.

15         Then you can see from the videos that we have recovered

16    he's in charge of the camera.  He's holding the camera.  He's

17    manipulating it.  When it's just him and her, you know, he zooms

18    in on the sex acts.  When it's her with other men, he gets good

19    shots.  He says, "Hey, Bryan, are you there?"  He tells Ragon,

20    and this is in Exhibit A also, he likes being behind the camera,

21    and my sentencing memo, you know, has the exact descriptions of

22    the videos where it's very clear that, like, he's into this.

23    And if he didn't want to do this, he was now in direct contact

24    with the victim.  They did cut Ragon out.  This wasn't like,

25    "Oh, my gosh.  I so need to have sex with her I better do this."

1    This is what him and Ragon did together.

2         And you can also see in Exhibit A where Peggs says, "I like

3    being behind the camera."  Ragon isn't saying, "You better take

4    images."  Ragon says, "Hey, while you're out, if you want to

5    take some images, you know, that would be good."  And he says,

6    "Yeah, I like being behind the camera."  It wasn't like, "Do

7    this or you can't have sex with her."

8         THE COURT:  Well, I thought it really was a condition.

9    Ragon expresses dismay that there were sexual liaisons between

10   the victim and Peggs and that they weren't recorded and shared

11   with Ragon.

12        MS. PFLUGER:  He wants that, but it is not a condition,

13   right?  I mean, Ragon wants -- he wants -- he's a voyeur.  He

14   wants to watch.

15        THE COURT:  There's the conversation between the victim

16   and Ragon where she paraphrases back to him that you're treating

17   me like a toy and I can be played with as long as it's video

18   recorded and sent back to you, and if we don't make the videos,

19   he's not allowed to play with it anymore.

20        MS. PFLUGER:  But then Peggs and the victim cut Ragon

21   out.  Then what's --

22        THE COURT:  Well, I think that's what prompts this

23   discussion about the requirement, Ragon's requirement that the

24   videos be made.

25        MS. PFLUGER:  Well, I can tell you in Exhibit A, he

1    said -- what Ragon says is, "I'm only going to be able to be on

2    Skype," so -- and then he says, "I'm just going to be able to be

3    on Skype watching at the hotel," and then he says, "But you can

4    take some video of anything else while you're out if you want."

5    It's not like, "You better take video."  And Peggs' response is,

6    "Great deal.  I like being behind the camera."  There's no,

7    like, "You must do this."  He says, "Hey, you can do it if you

8    want."  I mean, he wanted to be on Skype, yes, but there was no,

9    like, "If you don't do this, you don't have sex with her."  And

10   Peggs says, "Good deal.  I like doing that."  So I'm not

11   insinuating that Ragon didn't want video or didn't want to be

12   watching, but I'm also stating that Peggs enjoyed it, he

13   participated in it, and he was able to cut Ragon out and

14   continue the exploitation of the minor without Ragon.

15        The other thing, when Peggs says, you know, "This is

16   something I had to do.  I wasn't interested in images at all,"

17   he had a history of asking other women for images.  He asked the

18   victim for images when she got back from North Carolina.  On

19   January 10th, 2016, he said, "Hey, do you have any pictures of

20   you and Bryan?"  He wants images.  He liked -- he said to other

21   women he masturbated to the images.  He asks her for images, and

22   when she says, "No, no.  I don't have any of me and Bryan" --

23   she just sent a picture of her a little bit revealing, like her

24   shirt was off her shoulder -- and then he said, "No, I want

25   more."  And she said, "You want more or you demand more?"  He

1    said, "I demand more," and she sent him child pornography, and

2    he's interested in images.  And there are also times when the

3    victim is talking to Ragon, and he says -- Ragon says, "You

4    know, I didn't get those videos from the other night," and the

5    victim says, "Well, I don't know when he was recording or what

6    he was recording."  So she's not a part of this.  It's between

7    him and Ragon.

8         Those are the three main points that the defense focuses on

9    in their sentencing memo.  The other things I want to focus on

10   are just the defendant's lack of responsibility, his complete

11   denial of anything that he doesn't have to admit to.  And, for

12   example, in the sentencing memo, you know, he says he either had

13   to have group sex or produce images to have sex with the victim,

14   and that's not accurate, and he wasn't forced to have group sex.

15   I'm not bringing up his sexual life to humiliate him, only to

16   show he's not taking responsibility.  He says with the victim,

17   you know, "Ragon forced me to have group sex."  It's clear from

18   the videos and from the texts he's recruiting as well as --

19   yeah, Ragon is recruiting, but Peggs is recruiting too.  And

20   other women who were interviewed stated that Peggs was heavily

21   into the swinger scene and reported having group sex with him

22   completely outside of this victim.  So to make it seem like,

23   well, you know, Ragon forced me to invite all these other people

24   is just not accurate, and it's an example of him not taking

25   responsibility.

1      The other thing that he says, which, again, is a

2   diminishment of the crime he committed, is, you know, the most

3   he ever met her was seven times.  Well, the reason he's saying

4   that is because he can't deny those seven times.  We have the

5   hotel receipts.  But there is circumstantial evidence that he

6   met her far more times, not to even mention she says they met

7   much more often.  She says from the very beginning, "He was

8   my -- I saw him constantly."  They were in constant

9   communication.  So we have the seven times when he can't deny

10   it, and then we have images recovered from the deleted space of

11   the victim's computer.  It's the images that start with the

12   dollar sign and the RO.  The case agent looked at those and

13   said, "Those look like Peggs."  He can't confirm because he

14   can't see the face, but those are very consistent with Peggs.

15   That's very consistent with the victim.  And this is a time

16   aside from the seven we already have.

17      There was also a text between Ragon and the victim November

18   20th, 2018, where Ragon tells the victim, "Hey, Peggs wants to

19   know where he should go because he can't get a hotel room

20   tonight."  There's rooms booked in a lot of other men's names,

21   and there's no denying group sex was going on.  So to say the

22   absence of other hotel records means they never had sex any

23   other time just isn't accurate.  There are indications that they

24   met more.  There are indications that group sex happened and

25   different people rented the hotel rooms and that it was more

1    than just the seven times, and this is just another attempt of

2    his to just diminish his conduct to the very least he has to

3    admit to.

4         Peggs says that the only criminal liability in this case

5    comes from the accident of the victim's age.  That's from his

6    sentencing memo.  And defense says that the Court should

7    consider Peggs' mindset when punishing him, and usually the

8    Court punishes defendants for a mindset that's flouting the law.

9    And then the defense does say, "Well, it's true there are some

10   strict liability, but the crime here is just sex with a

11   17-year-old, and that would be a misdemeanor."  That's not

12   accurate.  This is production of child pornography, which is

13   strict liability.  That's not what he pled to, but it's what he

14   did, and the evidence shows it.  That is strict liability.  You

15   don't get a pass for making a mistake.  The evidence shows he

16   didn't make a mistake, but if he did, you don't get a pass for

17   that.  Sex trafficking, you don't get a pass for that.  That's

18   reasonable opportunity to observe, and he did that.  So this

19   isn't comparable to a misdemeanor of just having sex with a

20   17-year-old.  This is comparable to production of child

21   pornography and sex trafficking.

22        And defense also mentions that there's 60 to 80 other men

23   that, you know, Ragon arranged for the victim to have sex with

24   when she was a minor, and these men didn't get criminally

25   charged.  Most of these men are not identified.  These men did

1    not communicate with Ragon.  They did not collaborate.  They did

2    not set up group sex.  They didn't film it.  The government's

3    not condoning anything that these men did, but they are not in

4    the same position as Daniel Peggs.

5        THE COURT:  There was one or two, I believe, that it

6    seemed pretty clear that they were trafficking her.

7        MS. PFLUGER:  I will get to those.  So there are four

8    key players in the government's view:  One was Dan Peggs; one

9    was Ragon, who's already been sentenced; one was a man from Rice

10   Lake, who the government had been looking into, and I can show

11   you this news article that he committed suicide, so we can no

12   longer look into him; and another is a man from Minnesota who

13   the government has referred the case to Minnesota, and what they

14   are doing I can't direct.  But it's not as if we just gave a

15   full pass.  We are doing what we can do to hold those

16   accountable who should be held accountable.  Now, look, 60 or 80

17   men who had sex with the victim once or twice, should they face

18   something?  Yeah, they should, but they are nowhere near in the

19   same seat as Dan Peggs.

20       The things that the Court is supposed to -- that the law

21   says that the Court should consider in sentencing is, first, you

22   know, the nature and circumstance of the offense, and Dan Peggs

23   met the victim when she was very, very vulnerable, and no one

24   disputes that.  She had mental health issues, depression,

25   anxiety, and there is no doubt that Bryan Ragon is sick and

1    twisted and got what he deserved.  He met her September 26,

2    2015, had sex with her a week later, and by October 14th, 2015,

3    he had her on Craigslist.  He was a voyeur.  He liked watching.

4    And then by October 22nd, Jake, Dan Peggs, was involved.  And he

5    started just like a lot of the other guys, a guy she had sex

6    with, but like I said, when she met him in the hotel for the

7    first time, she said, "I have a confession.  Someone is watching

8    on Skype."  He says, "That's awesome," and from there him and

9    Ragon are co-conspirators and co-collaborators.  The victim says

10   that she saw Peggs constantly, and it's clear that Peggs and

11   Ragon communicated.

12       The victim stated that she saw Peggs as a friend.  You

13   know, it's not what I would call a friend, a man twice her age

14   who is arranging for himself and others to have sex with her and

15   film it for his sexual perversion and Ragon's sexual perversion.

16   But she's a vulnerable 17-year-old, and she trusted him, and

17   like all the letters from the community, her trust was

18   misplaced.  This isn't about a crime to the community, but it's

19   just saying many people trusted him.

20       When she stepped away from Ragon -- so she went to North

21   Carolina in December 2015, and the defense describes this trip

22   as the victim engaging in extreme BDSM.  The government would

23   describe it as she was subject to degradation, physical abuse,

24   humiliation beyond words.  It was too much for her to bear, and

25   after that, for the most part, not completely, but for the most

1    part, she cut off Ragon.

2        THE COURT:  Did Mr. Peggs know what had happened with

3    her in North Carolina?

4        MS. PFLUGER:  I'm getting to that.  She came back, and

5    she says, and this report has been provided to defense, Peggs is

6    the only person she told, the only person, that there had been

7    bestiality, that there -- she had been forced to do unspeakable

8    things.  He's the only one she told.  And what did he do?  He

9    stepped in and filled Ragon's shoes, not to the extent -- I'm

10   not saying he practiced bestiality, but he continued her

11   exploitation.  Instead of saying, "Hey, you need help.  You

12   should, at the very least, get counseling, go to the police,

13   something," no.

14      The defense talks a little bit in their sentencing memo

15   about deterrence, the deterrent effect here, and that's also a

16   factor the Court should consider.  Peggs says he didn't set out

17   to have sex with a minor, and that's true.  The government

18   doesn't allege he did.  He was looking for sex with anyone.

19   He -- I don't know if you would call it an addiction, an

20   obsession.  He has a sexual preoccupation, and that is clear

21   from the records, from the psychosexual report.  He knew about

22   this.  He had sought treatment.  He had gone to Sex Addicts

23   Anonymous.  He had gone to some treatment, but he still had this

24   fake persona and was out looking on Craigslist for ads that say

25   "younger slut" or something to that effect, and in doing this,

1    even before having sex with a minor, he was putting everything

2    on the line.  Look, if people in his hometown knew he had a fake

3    persona and was responding to Craigslist ads and having group

4    sex and into all -- his career would have been over, but it

5    wasn't enough to stop him.  And when he found out the victim was

6    a minor, that wasn't enough to stop him either.  The reason that

7    he's a danger to the community is because nothing deters him.

8    The risks -- he didn't set out to have sex with a minor, but he

9    did, and when he found out, it didn't bother him.  And, again,

10   not saying this to slander Mr. Peggs' name, but it's a fact

11   that's in the reports, up until the day before he was arrested,

12   he was still seeking women online.  He was in Madison the day

13   before he was arrested and found a woman on Exotic Escorts or

14   some similar website, a website known for trafficking in

15   prostitution, and had her come to his hotel.  I can't say what

16   they did, but she showed up and said, "What's your room number?"

17   He, at that point in 2020, he now knows, "I better be careful.

18   I've already had sex with a minor," and he's still doing it.

19   The reason you need deterrence is because nothing else -- the

20   reason he's a danger to the community is because nothing else

21   has stopped him.  I'm not saying he's like, "I like minors.  I'm

22   going to go have sex with a minor."  He's like, "I like sex, and

23   I will do what I want with who I want.  Damn the consequences.

24   Damn the consequences to my family, to my job, to my community,

25   and to the victim."  That is why he's a danger.

 1        And the deterrence effect is so that others see this is a

 2   serious crime.  You can't -- no one, okay, not a bricklayer, not

 3   a -- you can't take this chance, but a school superintendent or

 4   a school principal, you don't get the luxury of saying, "I

 5   thought she was 18."  No one gets that, but especially not you

 6   and when you know better.  You have been trained in this.  We

 7   are not making an example out of Mr. Peggs.  His conduct

 8   deserves what -- the charges he got, but it doesn't make him --

 9   it makes him more culpable because of he was educated, he was

10   around students, he knows teenagers are vulnerable.  He's aware

11   of all this, and yet he kept doing it.

12        The final thing that the Court has to weigh is the impact

13   on the victim, and she will speak after we finish, but I can

14   tell you, of course, Bryan Ragon was traumatic.  It was a

15   terrible experience in her life, but it's a different

16   experience, and she will talk about that, because Dan Peggs is

17   here.  She didn't go to college in Eau Claire because she wants

18   to stay away from him.  She's afraid of seeing him.  She picked

19   a different college.  Dan Peggs has an impact on her everyday

20   life that Bryan Ragon in North Carolina never did because he's

21   there.  Dan Peggs is part of her world, her community, and she

22   has been aware all these years, until she was strong enough to

23   come forward, that, "He's still teaching.  He's still around

24   girls my age," and that has had a much different impact on her

25   than Bryan Ragon did, not at all diminishing what Bryan Ragon

1    did.  What he did was terrible, but what Dan Peggs did was also

2    illegal, wrong, terrible, and had a different kind of impact.

3    So to say that this all -- you know, the impact on her was all

4    cumulative and you can't attribute certain things to him and --

5    you know, it's not true, and she will talk about because of who

6    he is, where he lives, and his integration into her world, his

7    conduct had a very specific impact on her.

8         The government asks you to look at all these different

9    factors, the nature and circumstance, the protection of the

10   public, the deterrent effect, and the history and

11   characteristics of this man and then listen to the victim, and

12   we are asking for a sentence of ten years, Your Honor.

13             THE COURT:  Thank you.

14        All right.  So to be specific about when we're going to

15   hear from the victim, after we hear the argument and allocution,

16   everything, at the very -- she wants the last word?

17             MS. PFLUGER:  Yes.

18             THE COURT:  Okay.  All right.  Very good.

19        Mr. Bugni?

20             MR. BUGNI:  I think the last word goes to the

21   defendant.

22             THE COURT:  Let's have the victim statement before the

23   allocution.

24             MS. PFLUGER:  Okay.

25             MR. BUGNI:  Normally I would just begin with just

1    asking some questions, Judge, let me know where you're at.  One

2    thing I feared in this case was that I would walk into

3    sentencing and I would hear that, and the reason --

4           THE COURT:  I think you should have known you were

5    going to hear that.

6           MR. BUGNI:  Well, I'm okay with most of that, because I

7    embraced some of that in my sentencing memo.  I know the

8    discovery.  I know every aspect of this case because we were

9    ready to go to trial in this case, and what I heard was not the

10   discovery, just like what I saw in the sentencing memo was not

11   the discovery.  There's a difference between the lawyer who is

12   willing to cite everything and say, "Here is my homework.  I

13   want you to know what I know, and I want you to see what I see,"

14   because that lawyer is sitting there and saying, "Test it.  I

15   know what I have."  And what I have is different from that, and

16   what I know is far different from that, and I'm now going to go

17   piece by piece, and if you have questions -- but I want to make

18   sure I get enough in there because there's a reason I showed my

19   work in the PSR objections and in every footnote of that

20   sentencing memo, and I want to go through it.

21      This was an extensive investigation, a quarter million

22   pages, and it wasn't because it was so expansive and it went

23   years and years and years.  It was because KV1, or Doe, had

24   backed up her computer.  It was because we had so much

25   information from her.  It's inaccurate to say that most of this

1    came from Ragon.  The four terabytes of movies came from Ragon,

2    but we were at about 160,000 pages of discovery before Ragon

3    decided to debrief.  So we had a very good universe of the

4    facts.  They had turned over everything in Peggs's life.  If

5    there was something they could substantiate to let any of what

6    they were throwing at him stick, they did.

7        So they went and interviewed -- whenever there was somebody

8    who they thought they could get with another group sex, they

9    went and found them, and I'd ask that these -- I mean, I don't

10   know, I kind of want to actually name the names, not because I

11   want to out anybody, but because you should know this is how

12   much confidence we have in who they interviewed, all right?

13   Mr. -- I'm just going to go C.R.  C.R., they go and interview

14   him, and he remembers it because he lived together with her, and

15   he puts the group sex with Peggs as when she was an adult in

16   2018.  They go and talk to D.K. -- or D.H., and he says, "Oh,

17   yeah.  No, I remember her, but it wasn't with that guy.  I have

18   never met that guy.  I don't even know who that guy is."  And it

19   went and continued all the way through everyone they

20   interviewed.

21       So the idea that we're disingenuous or we don't know the

22   facts or we're trying to hide the ball, this was an extensive

23   investigation that nailed down every day and where everybody was

24   and where Peggs was, and nobody could place him in any other

25   event than those seven.  It's not that -- fine, I'll give you

1    one more.  Go to one more.  Then he's there with her eight

2    times.  That's it, eight times.  But we know the seven, and the

3    reason we don't give them the eighth is because we asked to see

4    that video and said, "Hey, can we see this video?  Can we see

5    this video?  Can we see this video?"  Nothing.  We weren't able

6    to see that video.  And, "It looks like Peggs"?  Almost all the

7    guys look like Peggs in these videos.  You can't see his face,

8    and you don't have a date stamp, but even more so we were able

9    to show who it was that she was with that night at the

10   Fairfield.

11         So this isn't an idea that, like, there's somehow these 25

12   other dates, and we're somehow hamstrung.  Anytime -- all the

13   communication with these men and with Doe is all preserved.  We

14   know who it is.  In our office for about a year, we had butcher

15   sheets of everybody because -- not because we glorified in it,

16   but because we knew that these allegations weren't true, and so

17   we needed to know who they were attributed with because this is

18   such an expanse of allegations, and it's such an expansive time,

19   60 or 80 guys over this broad period of time.  Of course,

20   there's going to be conflating of details.  Things are going to

21   get lost, and the same way that you and I or Ms. Pfluger might

22   get lost in a case -- I don't remember when I went to trial with

23   you in Karl McKenzie.  I know it happened.  I don't know when it

24   was.  I know I lost.  But, like, I don't know much about those

25   exact things because things start to separate.  And that's what

1    happened here is that there were details that she was confident

2    in that didn't pan out, and what we heard today were actually

3    more details that don't pan out or don't rhyme with the

4    discovery that we have and the investigation that we know so

5    well.

6          THE COURT:  If you would, I kind of feel like we're

7    getting out into the margins of details that aren't really

8    central to the case, because you're right, it's easy to get lost

9    in this case because of the volume of discovery.  But I get it,

10   there may be more, there may be less numbers of meetings, but we

11   have the seven times.  We have some of them video timestamped,

12   hotel receipts, corroborated that she was 17, and Mr. Peggs was

13   there having sex with her.

14          MR. BUGNI:  Got it.

15          THE COURT:  And so if your defense is it was only seven

16   times, I'll take your point, and we can move on from there.

17          MR. BUGNI:  That's an important point though because

18   you can't put a lot of these activities beyond those seven times

19   then because, you know, he's so into making movies?  Then why is

20   it that the movies are all on the 23rd and the 30th of October?

21   And then he goes and has sex with her again, and then Ragon is

22   like, "You better make that movie.  Make that movie," and he

23   does one more time, and that's the universe of three videos.  So

24   if he's so in love with this making child pornography, why do we

25   only have those three times, and why are they isolated and

1    exactly when Ragon says.

2          And as far as whether or not it's a condition -- this is

3    why these things matter.  Is it a condition?  Page 6 of our

4    sentencing memo, each one of those says, "Hey, there's a

5    condition."  This is from Doe.  "Hey, there's a condition.  Hey,

6    there's a condition."  And even Ragon himself is saying, "Look,

7    if you want to do this, you're not going to cut me out.  I'm

8    getting what I want out of this."  It is a condition.

9          THE COURT:  This to me strikes me as another detail

10    that's not really central to the case.  I get that, and I asked

11    Ms. Pfluger about it.  I understand that Ragon wanted the videos

12    as a condition of having sex with a person he regarded as his

13    property, and Mr. Peggs said, "I'm all there for you.  I'm going

14    to set up these group sex things.  I know you want more guys.

15    We're going to do it that way, and I'm going to make the

16    videos."  It doesn't come close to a duress defense.

17          MR. BUGNI:  No.

18          THE COURT:  And so I get it.  That was the scheme, and

19    that's what Ragon wanted, and Mr. Peggs willingly participated

20    in it.

21          MR. BUGNI:  Yeah.

22          THE COURT:  And Ragon was upset when he had sex with

23    her and didn't videotape it, but I don't see that as really

24    meaningfully diminishing Mr. Peggs's culpability.

25          MR. BUGNI:  Well, I think the culpability is did he go

1    there with that intent that, "I want to make these videos."  Is

2    that what --

3          THE COURT:  Yeah.  It was planned.  He was -- he and

4    Ragon worked together to do this thing, which was to have a

5    group sex episode videotaped and live streamed to Ragon.

6          MR. BUGNI:  Okay.  And to -- that he doesn't hold on to

7    these videos, that he doesn't actually -- he seeks not to make

8    them when he doesn't have the chance, and that there's no

9    evidence of an otherwise interest other than what's apart from

10    that.  And what I say about that is we have one other one, S.B.,

11    that's it, in 2018 where he's like, "Hey, you know, that was

12    great," all right?  From this expanse of into his life, that we

13    only have those three instances and then a fourth in 2018 with

14    an adult?  That's the universe of what he's doing.

15        Now, if your question is to the harm, you know, like are we

16    trying to punish him and deter him and keep society safe because

17    he has such an abiding interest to make child pornography?  Or

18    is it, like, hey, did he willfully go in here and have sex with

19    her and allow himself to be videotaped?

20          THE COURT:  Well, he didn't allow himself to be

21    videotaped.  He made the videos.  He controlled the camera.

22          MR. BUGNI:  Sure, but it was a condition --

23          THE COURT:  And I also take this point:  I don't think

24    he's a professional child pornographer.  That's not what he's

25    doing.  Okay?  And I get that.  He didn't set out at the

1    beginning of this to say, "I'm going to make child pornography,"

2    but he was willing to do it --

3          MR. BUGNI:  He was --

4          THE COURT:  -- and eager to do it when the situation

5    presented itself.

6          MR. BUGNI:  Willing and eager for someone who said she

7    was 19, who showed him a fake ID that she was 19, who by

8    all accounts --

9          THE COURT:  Showed him a photograph of a fake ID.  Ms.

10   Pfluger, I think, did a good job of really laying out what the

11   situation is, and I get it.  I don't have a copy of a text or a

12   video recording where she says, "I'm 17 years old," but there's

13   a lot of circumstantial evidence that suggests that, at the bare

14   minimum, Mr. Peggs should have known she was 17.

15         MR. BUGNI:  Why?  I don't understand why he should know

16   something that -- it's a matter of six months, and he's relying

17   upon the representations of someone who has agency and who also

18   goes so far as to make a very good ID on her phone and who comes

19   up with a backstory of it and gives all these other indications

20   of, like, "Look, I'm in photography."  And we ask what more he

21   should have done?  Well, he looks her up.  He says, like, "Hey,"

22   like, "is this the person?"  I'm looking at it, and his Google

23   searches are for someone who would be 19.  It's a sincere belief

24   in that regard.

25         THE COURT:  That's ambiguous really.  So he does the

1    search to see if she's in the class of 2015, and he can't find

2    her.

3            MR. BUGNI:  And so then -- but he doesn't do one for

4    2016.  He does 2014, both the ones that would put her at that

5    age.

6            THE COURT:  I'm looking at all of this.  I will say --

7    and Mr. Peggs has his letter where he denies this, but Mr. Peggs

8    really doesn't come to the Court with a lot of credibility.  But

9    I have the photographs of the victim that he did receive.  I

10   have other photographs of her, and I have all the other

11   documentation of people who did question her age because she

12   looks extremely young.  And there are red flags all over the

13   place that she is underage.  And there's the incident in which

14   the victim herself says, "He's accusing me of being in high

15   school."

16           MR. BUGNI:  That's not what he said.  He said, "I'm

17   accusing you" -- "he's questioning my age at that moment," and

18   then she satisfies him and says, "Here it is.  Here's my fake

19   ID."

20           THE COURT:  It's conceivable, and I think that -- I

21   often say this in court -- not that many people really lie, but

22   people are very good at convincing themselves that what they

23   want to believe is true.  And so maybe that's what's going on

24   with Mr. Peggs.  Maybe he persuaded himself that she was 19, but

25   that was unwise, as it turns out, but also, I think, very

1    unreasonable.  I think if I look at the evidence here, it just

2    seems to me that there are red flags all over the place and that

3    it borders on willful blindness to believe that she was 19 years

4    old, and the linchpin of it is the photoshopped ID, which isn't

5    even an ID.  It's just a picture.  And so she never produces a

6    card that's fake.  It's just a picture.  And surely Mr. Peggs is

7    sophisticated enough to know there's such a thing as Photoshop.

8    I think many people were suspicious because she just had a

9    picture of it.

10            MR. BUGNI:  I'm sorry --

11            THE COURT:  And so I'm just -- it's just not a very

12   compelling case that he was reasonably convinced that she was

13   19.  And then the overarching problem is it doesn't even matter

14   because knowledge of the age of the victim is not an element of

15   production of child pornography or sex trafficking, as Ms.

16   Pfluger pointed out.

17            MR. BUGNI:  Okay.  So I'll address both then.  I'll

18   tell you, why don't we just -- I'm going to help -- I want to

19   help you.  You tell me what exactly -- other than those three

20   things, which I'm going to address, what are the things I should

21   focus on, because that's what I'm going to focus my remarks on.

22            THE COURT:  Because I get it.  There is a lack of

23   knowledge about how many times Mr. Peggs and the victim met, but

24   we know it was seven times, and we know what happened on those

25   times, and we actually have video of it on the -- on the one

```
1    time.
2              MR. BUGNI:  You have three.  You have three times that
3    they have video.
4              THE COURT:  Well, again, go over the dates.
5              MR. BUGNI:  Okay.  So October 23rd you have video,
6    October 30th you have video, and then December 2nd you have
7    video.
8              THE COURT:  The December 2nd I'm thinking.  Those are
9    the ones that are really described here.  So we have video
10   confirmation of those times.
11             MR. BUGNI:  Right.
12             THE COURT:  And so -- and then we know that Mr. Peggs
13   continued -- after she turned 18, he continued to contact her
14   after that, so we know that.
15             MR. BUGNI:  On three occasions, yes.
16             THE COURT:  Okay.  And so Ms. Pfluger takes the
17   position that there are more times based on the testimony of the
18   victim that are not corroborated by documentary evidence, but
19   the fact is we have enough to know that it did happen multiple
20   times and that Mr. Peggs was arranging, in coordination with Mr.
21   Ragon, group sex events that were videotaped.  It didn't
22   happen as many -- your position is, and I probably will not be
23   able to determine the precise number of times, and I will
24   probably have some doubt about whether there were more than the
25   seven times that are documented, but I don't really see that
```

1    as -- you know, sometimes I just don't know all of the facts,

2    and we fight about those things.  And so I'm not quite sure how

3    many times there were, but I know there were seven, and that's

4    the core of his culpability.  And whether there were more, I

5    don't know that it matters that much.

6          MR. BUGNI:  Okay.  Then I'm going to address those

7    three points.

8          So the best argument, and really the one that no one

9    wrestles with, is why does he break it off then?  I get you have

10   the willful blindness.  Okay, fine.  He's kind of -- but if he

11   doesn't find out then, if he doesn't actually stop, then

12   where -- there are no more encounters.  What --

13         THE COURT:  He stops because she now knows who he is.

14         MR. BUGNI:  That's --

15         THE COURT:  He's got the real identity then.

16         MR. BUGNI:  But then why does he begin again in July?

17         THE COURT:  That's a darn good question.

18         MR. BUGNI:  Because --

19         THE COURT:  Because he thinks it's legal now.  He

20   thinks -- he knows she's 18.

21         MR. BUGNI:  No.  I mean, Your Honor, it militates

22   towards it's not that she knows who he is and then he breaks it

23   off, and now, you know, somebody can know who I am.  The other

24   women he's having affairs with know who he is even though he

25   uses Jake Thompson, all right?  So it's not the fact that, like,

1    "Oh, they're going to contact my wife."  It's, "Oh, my gosh.  At
2    this moment, you know, this is what I have."  I'll grant you the
3    willful blindness, okay?  He should have known and should have
4    done better, but it was more than just, "I kind of just didn't
5    pay attention," you know?  There were a lot more steps here to
6    that, and I think if you're going to take the 60 men and the
7    evidence that we have of those who -- and you have two who
8    question and said, like, "Man, that's not right.  I'm going to
9    keep on reverse searching or making sure that this is right,"
10   well, okay, yeah, that's there, but then the other people in the
11   heat of the moment didn't have that or didn't have that same
12   aspect of it.  And I think could Peggs have been fooled?  Yes.
13   I sincerely believe Peggs is fooled at that moment.  Does it
14   matter?  That's really your central question is, like, does it
15   matter for production of child pornography?  Does it matter for
16   trafficking?
17        I take two issues.  One, when it comes to trafficking, I
18   don't know if everyone is operating on different definitions of
19   trafficking.  Trafficking of a quid pro quo and there being no
20   money exchanged for the sex but merely the use of the hotel,
21   that's what we had here, that Peggs is like, "Look, can anybody,
22   you know, help me pay for the room that we're going to use," and
23   that's it.  The sharing of the cost of the room is not a thing
24   of value that's being passed on to her that this is trafficking.
25   Otherwise --

1          THE COURT:  She doesn't have to get any money for it.

2          MR. BUGNI:  He doesn't get anything other than

3     reimbursed in part for the room that he just spent.  So now

4     we've made a federal crime of anytime somebody is going to share

5     the cost --

6          THE COURT:  Of a hotel room to have sex with a

7     17-year-old girl with a bunch of guys.

8          MR. BUGNI:  And does that -- that becomes trafficking

9     and that, like, "I'm going to split it."

10          THE COURT:  Here is another thing --

11          MR. BUGNI:  If she was 18 --

12          THE COURT:  -- we're also, again, getting off track.

13     Ms. Pfluger is responding to your comment that they're really

14     not pursuing the trafficking, as though there is no evidence of

15     trafficking.  Her response to that is that's not the main focus

16     of this case, but trafficking occurred, and she explained her

17     theory of it.  And this isn't really a traditional trafficking

18     case, but her point is it probably meets the elements of it.

19     And whether she gets the -- the victim gets any money is utterly

20     of no consequence, and whether you can defend it and say that,

21     "Well, he didn't get money for the sex.  He got money for the

22     hotel room," that's kind of a fine point, and, again, it's not

23     really the heart of the case.

24          MR. BUGNI:  So the heart -- I mean, you said, like,

25     hey, trafficking is the heart of the case, and now I'll go to

1    the heart of the case of production.  But, like, it does matter.

2    If you're saying --

3               THE COURT:  It does matter.

4               MR. BUGNI:  Yeah.

5               THE COURT:  I agree.  I mean, look, he was indicted.

6    The public controversy was led by that particular charge, so I

7    take it it's very significant, and I think Ms. Pfluger has

8    responded, I think, appropriately to your criticism of the

9    government's case on trafficking, and she's explained her theory

10   of it, and so -- but she's also said this is really about the

11   production of the child pornography.  So to say it's -- I don't

12   want to say it's not important, but it's not really the heart of

13   the case.  It's not the core of the case.

14              MR. BUGNI:  The core --

15              THE COURT:  It's not a very traditional sex trafficking

16   case, but it probably meets the elements.

17              MR. BUGNI:  I would -- we'd be in trial if that's what

18   it was going at.

19              THE COURT:  Yeah.

20              MR. BUGNI:  And that would be the first case in the

21   history of the country that said, hey, something that was just a

22   sharing of a hotel room has now become trafficking.  But let's

23   go to what your real concern is:  Is this really production of

24   child pornography --

25              THE COURT:  Yes.

```
 1          MR. BUGNI:  -- all right?  Is it that we're going to

 2    ding him like we do most people who produce child pornography --

 3          THE COURT:  Maybe I can help you out here too, and that

 4    is that I do think knowledge and intent really affects

 5    culpability, even if it's not an element.  So the fact that he

 6    thought she was 19 when he made the videotapes is a factor that

 7    I would consider because I think it's not an element of

 8    production of child pornography.  He is guilty of child

 9    pornography.  It's clearly anticipated that it's relevant

10    conduct because the plea agreement stipulated that the videos

11    that are cited in the plea agreement constitute depictions of

12    sexually explicit conduct.  So it's relevant conduct.  His

13    knowledge of her age is not an element of the charge of child

14    pornography, but it does affect his culpability.  So that's why

15    I think it's important to figure out what did he know, when did

16    he know it about her age.  So we've already discussed that

17    aspect of it --

18          MR. BUGNI:  Right.

19          THE COURT:  -- okay?  And I think it's at least willful

20    blindness.  I harbor my doubts about whether he, in fact, didn't

21    really know her age.  I'm not persuaded that he didn't know her

22    age, but it does really matter.  And so that goes to his

23    culpability for producing the child pornography, which he did,

24    but not everybody who produces child pornography is in the same

25    category of -- it's not the same spot on the spectrum of evil.
```

1    So it does matter.

2              MR. BUGNI:  It does.  It absolutely does.

3              THE COURT:  And he didn't set out to make child

4    pornography.  I'll give you that too.  This isn't somebody who

5    said, "I'm going to become a child pornographer," and he didn't

6    do that.

7              MR. BUGNI:  Exactly.

8              THE COURT:  I don't think he had a special interest in

9    having sex with minors.

10             MR. BUGNI:  No.

11             THE COURT:  But he was willing to have sex with a

12   minor.

13             MR. BUGNI:  He was willing to have sex with somebody

14   who is a minor who said she was 19, and he turned a blind eye,

15   but think about the small gradients that we're talking about of

16   six months.  Had it just been six months later, everything

17   happens in June --

18             THE COURT:  It cuts both ways.

19             MR. BUGNI:  In what --

20             THE COURT:  It's like this:  So after he finds out that

21   he has been involved with arranging group sex acts and

22   videotaping sex with a 17-year-old girl who's been traumatized

23   and vulnerable, he waits until her birthday and then a couple

24   months later then tries to start up again and is eager to start

25   having sex again with her.  She's still just as much a

1    vulnerable, traumatized young woman as she was two or three or

2    six months before.  It's now legal in the sense that she's

3    crossed the threshold into adulthood, but it's still morally

4    repugnant.

5          MR. BUGNI:  Yes, it's absolutely morally repugnant.

6    It's so morally repugnant.

7          THE COURT:  Yes.  It's not illegal anymore, but it was

8    illegal before.  And so, yes, it's a fine distinction, but it

9    really matters.

10          MR. BUGNI:  It does.  It matters.

11          THE COURT:  It does.  It does matter, but it's still --

12    the fact is it's not like he was having -- it would be worse if

13    she were 13.  All of these gradations matter, but the fact is

14    that he produced child pornography with a minor.  It's child

15    pornography, and he produced it.

16          MR. BUGNI:  And he's a sex offender, and he's -- look,

17    his whole life is ruined.  He goes from making $135,000 to

18    working sanitation at the factory, but, like --

19          THE COURT:  So what we're arguing about here really, it

20    seems to me, is despite your suggestion that there's this

21    enormous gulf in the case, I don't really see an enormous gulf

22    in the -- what happened.  I think we all understand what

23    happened.  I don't think there's that much of a difference

24    between the government's presentation of the facts and your

25    presentation of the facts.  There are things that to me seem

1    marginal, like how many other times did he meet with her and did

2    he know for sure that she was 17.  They aren't core issues, but

3    what we really and what I have to do is figure out how culpable

4    and how dangerous Mr. Peggs is.  I have to now deal with the

5    gradations of wrongfulness, and I see what I see, and I think

6    the facts are really somewhat secure.  So that's why, like, in

7    the sentencing memos, it always was the invocation of how

8    complicated a case and how easy it was to get lost.  For me what

9    I have to do is -- because I don't really see huge factual

10   disputes here.  What I see is assessing the wrongfulness of this

11   conduct, and your view of the case is that Mr. Peggs was a

12   sexual adventurer, a philanderer, and not just a crummy

13   husband -- I would quibble with that.  He's a nightmare of a

14   husband -- but I have to -- your view of the case is he was

15   that, and then along the way he stumbled into the arms of a

16   17-year-old girl that he thought was 19, and the worst thing

17   that he did was kept a souvenir of his sexual adventures with

18   her.  And Ms. Pfluger says, no, that's not really the way to

19   look at this case.  The fact is it doesn't matter whether he

20   knew she was 17.  He produced child pornography, as a legal

21   matter.  He produced child pornography and, she says, also

22   trafficked her, but the focus is on the production of child

23   pornography.  And so they're just gradations of how we view this

24   conduct that we all agree happened and then assess -- come up

25   with an appropriate penalty for it.

1        MR. BUGNI:  Right.

2        THE COURT:  So that's what I think we're here about,

3   and Ms. Pfluger has presented the case -- as always, I have two

4   very capable attorneys in front of me, and you're very expert at

5   presenting a compelling case, both of you are.  I admire you

6   both, and you're doing your jobs for your clients and for the

7   people of the United States, and I have to now assess, like,

8   where on this spectrum of this producer of child pornography and

9   the sexual adventurer who got inadvertently caught up with a

10  17-year-old, which version of this is correct.  And I will tell

11  you I'm tending to see it a lot more in the government's way

12  because I don't think it matters that -- it's not an element in

13  the production of child pornography that you know the age, but

14  also I think that Mr. Peggs did know her age and was at least

15  willfully blind to her age.  And so -- you know, and as an

16  educator, he should have been alert, first of all, to the idea

17  that she might have been young because he works with young

18  people.  This isn't like somebody my age suddenly, like, unable

19  to tell the difference between a 16-year-old and a 21-year-old.

20  That's his line of work.  But, also, he knew about the

21  vulnerabilities of children and adolescents, and he just

22  exploited this person and harmed her.  And I think really, you

23  know, he's not Ragon, but Ragon is a point of reference in terms

24  of how bad this conduct is.

25        MR. BUGNI:  So let me just unpack --

1          THE COURT:  So pick up the pieces from my rambling here

2     and make your best pitch for why he is on the less culpable end

3     of the spectrum given what we know.

4          MR. BUGNI:  Because you've confused two things.  You

5     have confused what is the shittiness of Dan Peggs, the sexual --

6     I'm going to use your term -- the sexual adventurer, all right?

7     Like, it's a shitty thing to do.  It would be shitty if she was

8     27.  I'd be like, "That's a shitty thing to do."

9          THE COURT:  I agree with you there, and one of my big

10    jobs here is to separate the awfulness of Dan Peggs as a husband

11    and a man and focus on the criminality that I have in front of

12    me.

13         MR. BUGNI:  Exactly.

14         THE COURT:  And so I'm parsing all that out, and so I

15    got the -- many of the letters I have from the community don't

16    make those fine distinctions, understandably so.  They're

17    outraged because a public servant has engaged in this horrible

18    activity, but I'm not here to penalize him for the distasteful

19    things that he did.  I need to sort out that and focus on the

20    criminality.

21         MR. BUGNI:  Exactly.  And that's why -- that's why

22    those points I think earlier matter, and it's that it's wrong to

23    do this to any human being.  It is just wrong.  It is using a

24    person for your own sexual means.  They've become a means to

25    your end, and that's terrible.  That's not respecting her

1    dignity, and it's abusive, and it's terrible, all right?

2    Unfortunately, it's a world that we live in that facilitates

3    this and allows this, all right?  And it's one where the

4    criminal law is incapable of actually redressing what needs to

5    be done.  It's because we don't criminalize all terrible

6    behavior, all selfish behavior, and all immoral behavior.

7    Instead, we criminalize the particular acts that the legislature

8    has said this is what we're going to hammer you for, and this is

9    what you've pled guilty to, right?

10       When you try to take that area of the morality of this

11   sexual cesspool and say, okay, now I'm actually so mad at that

12   sexual cesspool that you were living in, and so were 80 other

13   dudes and probably thousands and tens of thousands of others,

14   I'm just going to hammer it, well, that's not just punishment

15   for him, and that's not just punishment for what you and I and

16   hopefully most of the people in this room say that's not how you

17   treat a human being.  Instead, the law says that we have to look

18   at exactly what he did and what really needs to be done for what

19   you're going to go and come back in and say I'm going to think

20   about the instrumental goals, all right?

21       If there were other aspects of Dan Peggs that said he was

22   flirting at the edges, all right, that he was flirting at the

23   edges with really young girls, I'd say, man, he does become a

24   danger.  But when they turn over every aspect of his life and it

25   really is limited to, like, five other women he's having these

1    multiple affairs with and they're all in their mid-20s and late

2    20s, some of them are married too, it's a cesspool, but it's not

3    somebody who is going to that.  And I agree with you, when he

4    was 28 years old, again, 28 years old -- this is six years

5    ago -- and after he finds out that she is, you know, 18 years

6    old and he re-engages in that relationship, it's a bad thing to

7    do.  It is.  But after that there's not much contact.  There's

8    three contacts.  There's once in a hotel, the two of them, then

9    there's once with a married couple, and then once a year later

10   with her boyfriend that he responds to the ad with.  If you were

11   to say, "Bugni, if he doesn't contact her in July, I agree with

12   you.  I'm going to give him probation because I agree he didn't

13   go in setting out to create child porn" -- I agree maybe he was

14   willfully blind, but I quibble -- and I use that word lightly --

15   quibble with the idea of, like, well, Judge, when did he find

16   out?  You know, like, I have a really good, firm grasp of, like,

17   when he found out, and there's not that alternative that you can

18   say with definiteness, and there is more of a visceral, like, I

19   just kind of think he's shitty, and so I believe he did find out

20   somewhere along the line, but I can't really explain what

21   happened on February 12th nor do I really understand everything

22   else of that break, all right?  If you were going to give him

23   probation if he doesn't contact her in July, then we really are

24   imputing that cesspool, that cesspool of sexuality that he's

25   part of, and we're saying, like, we're now going to allow that

1    to influence what we do with punishment because the punishment

2    for what he did --

3        He didn't set out to make the CP.  He didn't set out to

4    have sex with a 17-year-old, and he didn't try to keep those

5    videos.  Instead, he did keep that souvenir, but that is the

6    criminal behavior you're looking at, and to the extent you

7    divide that, that is a heroic action.  That's a courageous

8    action because it says I too hate what has happened to the

9    sexuality of this country.  I too hate how people use women.  I

10   too hate how people use other people, but that is for us as a

11   society to shun.  It's for us to expose.  It's for us to

12   educate.  It's for us to pray for, but it is not to go to prison

13   for.  We don't send people to prison who are deviants with other

14   adults and who are looking only for other adults in their

15   deviance.  Like, we did that for a long time and to very, like,

16   you know, marginalized groups.  And I think, Your Honor, that

17   when you take that stance and you say, "I am not going to allow

18   that morality -- or that immorality that you continued, and I

19   really am uncomfortable with you doing that," and you don't

20   impute it backwards, then the spectrum shifts.  The spectrum

21   shifts to my position because he's so far different from the

22   other CP people, the production of CP that we see, and you know

23   it too.

24       Like, I've sat here with, like, so many of them, and he's

25   just off the spectrum as far as what he knew, what he did, what

1    he kept, you know, what his purpose was, all of those aspects,

2    that you'd have to say, "Yeah, you know what?  He doesn't need

3    to be punished.  He's right that his life is over, that he's

4    going to have the hardest time ever, you know, seeing his kids.

5    It's right that you have to work as a janitor.  It's right that,

6    like, you know, anytime somebody Googles you that, like, they

7    find out how shitty you are as a human being."  All of that is

8    right, but none of that demands that you go to prison because

9    prison is left for a certain set of behavior, and this doesn't

10   fall within that.  And I think to the extent that you can

11   dissect that, that you draw that fine line, that actually

12   promotes the greatest respect for the law because the respect

13   for the law is not just limited to like, "Hey, are you going to

14   walk the line, Peggs?"  But the respect for the law says that

15   which is out there that I don't like and I'm not comfortable, I

16   don't punish that.  I'm able to divide that.  The respect for

17   the law says I punish you for what you did, for what you did

18   that was illegal, and I see within this spectrum of illegal

19   behavior where you fall, Mr. Peggs.  And just like you've said,

20   and quoting your words, he didn't set out.  It wasn't, you know,

21   like what he was driving to do.  And maybe he was willfully

22   blind.  I don't think it is the fact.  I really don't, and I

23   stand on that very firmly that it was July 12th -- or, sorry,

24   February 12th, and if those facts are true, which I think you've

25   embraced two of my three, then the probation sentence is

1    appropriate and prison is not.

2            THE COURT:  All right.  Thank you.  Shall we hear from

3    the victim now?

4        Good afternoon.  I just want to make sure the microphone is

5    as close to you as you can.  And you can stand up, but if you

6    point it at you, it will be fine.  Thank you.

7            JANE DOE:  Is this good?

8            THE COURT:  That's very good.  Thank you.

9            JANE DOE:  Okay.  Your Honor, I appreciate this time

10   given to me to introduce myself to you as a person and not just

11   a Jane Doe on a piece of paper.

12       If you were to ask me where I would be in five years before

13   I met Dan Peggs, my answer would most certainly be finishing

14   nursing school or beginning my degree.  But following even the

15   first few encounters, you would have barely gotten a shoulder

16   shrug.  That's how broken I had become.  The emotional and

17   psychological toll it had taken for me to watch someone with his

18   influence leave his position of leadership to come and have sex

19   with someone the same age as students in his school created a

20   black hole in my chest that sucked all respect for the mentor

21   figures in my life.  School became nothing to me.  Why should it

22   matter when people like him pulled the strings?  Who could I

23   really trust or respect?

24       I feel like a different person, a shell of who I used to

25   be.  I had reached rock bottom.  Even after I stopped contact

1    with Mr. Peggs, I had such fear and anxiety hidden inside of me.

2    For a while I tried to keep on with the facade of a normal life.

3    Sleep no longer came easily, if at all, a problem that has

4    continued for me to this day.  I was estranged from all family

5    and friends, going through the motions of life without

6    experiencing it.  Not long after, I found I could not function

7    with these secrets and memories inside my head, and I attempted

8    suicide the following spring.  I turned 18 in a behavioral

9    health unit with a window from the nurse's station directly next

10   to my bed and a camera recording every movement so that I would

11   not attempt to take my own life again.  I actually remember my

12   mom tried to bring me my favorite flavor of cupcake, red velvet,

13   and they would not allow me to have it until the kitchen could

14   remove the paper wrapping so I didn't try and choke myself.

15       I still struggle with mental health concerns: night terrors

16   post-traumatic stress disorder, severe depression, and anxiety.

17   After all the claims and confusion surrounding this case, one

18   thing rings true.  There's no misunderstanding as to what I went

19   through and what was done to me and what I will continue to go

20   through.  Daniel Peggs participated in sex with me as a minor

21   and produced images and videos that will never be scrubbed from

22   my mind or the internet.  Daniel Peggs is not just another

23   stranger and was not just another stranger.  He was a highly

24   educated upcoming pillar of his community and a skilled

25   influencer.  For him to say that he is not to be held

accountable for having violated a minor while producing media of
it continually would be inaccurate.  It took strategy and
forethought to have deliberately created lies, manipulated, and
gaslight me.  Because of the talks we would have into the early
hours of the morning, I believe he cared about me.  Most nights
after anything had happened we would sit around and just talk.
That's more than just another person.  I felt I was able to
divulge horrific things to him that no one else would
understand, things like what happened in North Carolina and
things he did absolutely nothing about.  But looking back, it
was just a tactic to manipulate and create a false sense of
trust.

Daniel Peggs drove from working with children my age to
meet me at a hotel he paid for on multiple occasions to have sex
with me as a minor and capture images and produce child
pornography.  He held a position of trust and renown that not
many people can attain.  He had wide access to people my age and
enjoyed the power he held in his place.  He enjoyed deep down
that he could choose which mask he wore.  It was his own little
secret.

Even dealing with the impact this one man has left on my
life, I am so glad I found the strength to come forward and say
something because this is the moment I have been given to speak
out against such unforgivable justice.  Right here and now is
where I will begin my healing journey, but it's just one of the

1    steps I need to take to find myself again.

2         Daniel Peggs, you no longer have any power over me.

3         From this day, I aim to never speak of him again, but I

4    hope that he will be thinking of me and everything that he has

5    done to me every day for the rest of his life.

6         In closing, Your Honor, I would like to voice my request

7    that you do not take this man's crimes lightly.  He is well

8    versed in controlling his thoughts, actions, and behaviors to

9    portray the best version of himself, and I truly believe that

10   there is no path for self-led redemption in someone who has gone

11   to such lengths to manipulate a person into the situations I was

12   faced with.  I have faith that you will do your due diligence

13   and utilize the full extent of the law to show me and other

14   victims of such crimes that coming forward is the best option

15   and justice is attainable no matter the timing or circumstance.

16        Thank you, Your Honor.

17        THE COURT:  Thank you for coming in today.  I'm glad to

18   hear that you're doing somewhat better, and I wish you the best

19   of luck going forward, and I hope this proceeding gives you a

20   launching pad to move forward --

21        JANE DOE:  I truly appreciate --

22        THE COURT:  -- in a healthy way.

23        JANE DOE:  -- your defense of me, even not knowing my

24   face so far.

25        THE COURT:  You're very welcome.  Thank you again.

1        All right.  Mr. Peggs, you've got the right to address me.

2     You don't have to say anything, but I'd be eager to hear from

3     you.

4            THE DEFENDANT:  Thank you.  Thank you, Your Honor.

5        I purposely did not prepare any remarks of any kind.  I'm

6     shaking.  I'm petrified.  I'm sorry for what I did, for the

7     relationship that took place, for the time that I spent for

8     doing what I did.  I was in a very dark place during that time

9     no doubt, and as I acknowledged in my letter to you, sir, my

10    behavior pushed to the margins of what was socially acceptable

11    sexual behavior regardless of knowledge of age.  I'm the father

12    of -- I'm the father of four beautiful girls that I need to know

13    have a role model that is different from what will be portrayed

14    to them.  I am -- I don't know how I will explain this to them

15    some day.  I'm blessed that they have a good mother.  And I have

16    a hard time separating the two of them as children in the school

17    system and the situation.  I do it -- I do attest to the fact

18    that when I learned her age, that moment caused me to have

19    physical changes.  I shook.  I cried.  That two-hour drive back

20    resonates with me like a dagger in February.  Regardless, it was

21    not behavior that I should have participated in, and I am 100

22    percent able to accept that.

23        When I did learn her age, I was beyond broken.  I was

24    scared not, honestly, for my career or anything of that nature.

25    My wife at the time and I had gone through a lot, and I was

1    still disrespecting her in a way that I should not have.  My

2    fear was driven from losing my marriage and being separated from

3    my children.  That is my reality now.  That consequence has

4    beared an incredible fruit that I still -- I cry every Monday at

5    my mom's house as I sit and have a conversation via Zoom with

6    those girls.

7         When she returned from North Carolina, I didn't know that

8    she had returned from North Carolina, but eventually she

9    mentioned some of the things that had happened, not to the

10   extent that I learned about in the discovery, more along the

11   lines that it was a weird situation and that she needed to start

12   to distance herself from Ragon, as I had already done.  Had I

13   known that she was that age at that time -- I was not willfully

14   blind.  The idea was presented to me.  Initially, it sounds

15   like -- and, again, my memory is scathed at times as well.  I

16   remember being skeptical, but I remember receiving or seeing

17   that ID and being convinced.  But it doesn't take away from what

18   she had endured.  It doesn't take away from what she continues

19   to endure, and as it's been discussed of my personal sexual

20   behavior in a very public way, it doesn't change the fact that a

21   school official was behaving inappropriately.  Legally the

22   question is up to what we're doing here.  I should not have been

23   doing what I was doing.  I should not have been in the place

24   that I was in, and I am incredibly sorry for what I have done.

25   Thank you.

1            THE COURT:  Thank you.

2        All right.  We'll take a recess.  People are going to want

3    to use the restroom and all that, so we will reconvene at 3:00

4    and we'll complete the sentencing.

5            THE CLERK:  All rise.

6        (Recess at 2:38 p.m. until 3:07 p.m.)

7            THE COURT:  Let me begin by thanking counsel for their

8    excellent work on the case.  I appreciate it.  It was a

9    complicated case with -- a lot of effort went into it.  I myself

10   have been dealing with the materials for several weeks.  There

11   really was a lot there, and I appreciate the guidance that

12   counsel has provided to me.  And, again, thanks to all of those

13   of you who took the time to write to me.  I appreciate having

14   all that input.

15       This is a case that I think is not a case of mere

16   possession of child pornography, which is the count of

17   conviction.  That, of course, sets the statutory sentencing

18   range at zero to ten years, but I think, as Ms. Pfluger

19   suggested, this is really more of a case that focuses on the

20   production of child pornography, and I think that is the -- kind

21   of the heart of the crime that I have here, although I also

22   agree with Ms. Pfluger that technically the elements of sex

23   trafficking would probably also be satisfied.  I think that

24   there was a commercial sex act here, which has a very special

25   definition in the law, which is something where anything of

1    value is exchanged for sex.  So when the individual contributed

2    the $20 toward the hotel room, I think that he had made a

3    contribution of something of value in exchange for the sex.

4         This is really not a very typical child pornography

5    production case nor is it a typical -- it's even less typical of

6    a sex trafficking case, and so in some ways it really does stand

7    on its own.  There aren't a lot of cases that are highly

8    comparable to this one.  This case does have a lot of features

9    that are common in criminal cases here, and I would point to the

10   defendant being someone who was very successful and accomplished

11   in one area of life but then compartmentalizes off another realm

12   in which a sort of different set of morality pertains and

13   commits a crime even though he's well regarded as a

14   superintendent of public instruction.  That is commonplace in

15   crimes.  People have people who love them.  They're kind to

16   other people, but there's some aspect of their lives where they

17   just have -- they play by different rules for some reason.

18        So I will, again, emphasize that knowledge of the age of

19   the victim is not an element in the crime of production of child

20   pornography.  The logic is that if you're close enough to a

21   person to make a recording of sex with that person, you're

22   charged with the responsibility of knowing that person's age.

23   So it is with sex trafficking.  If you have a reasonable

24   opportunity to observe the victim, you're charged with the

25   responsibility of knowing that person's age.  And so the fact

1    whether or not Mr. Peggs knew that the victim was 17 years old

2    at the time that the sex and the video recordings were made

3    really isn't an element of those offenses.  It does matter

4    though, I think, whether he knew because I think it would be

5    worse if he knew all along that the victim was a minor.  I think

6    that would make it worse.

7        And so it is a matter that I have spent some considerable

8    time digesting before today's hearing and trying to listen

9    carefully again today with the evidence that I have.  And I

10   don't find the defendant particularly credible about the age of

11   the victim.  He has stuck to his story that he found out on

12   February 12th, and I think that it may be the case that he had

13   persuaded himself that he believed that she was 19 years old.

14   That's possible.  The issue of the ID I think is something of a

15   puzzlement, but, again, I don't find that particularly

16   persuasive, largely because there were just too many red flags

17   about the victim's age prior to that time.  The fact that she

18   had to show him an ID at all I think suggests that the age --

19   her age was in play in some way, that people had doubts about

20   that, and I find it plausible that the defendant comforted

21   himself when he saw the fake that he could assure himself that

22   she was actually 19.  I can accept that explanation, but I think

23   it's, in a sense, it's kind of a flimsy one.  It's sort of -- as

24   I said, people are good at convincing themselves that what they

25   want to believe is really true so that when he saw that image of

1   that ID, he was happy to assure himself that she was not a

2   minor.  It was a kind of a self-delusion at best I think.  And,

3   again, it was important to me it was not a fake ID.  It was just

4   a photo of an ID that had been doctored in Photoshop.  So if you

5   wanted to get into a bar using a fake ID, I think you'd need the

6   actual physical object and not just a picture of it.  So it's

7   really not strong evidence of that.

8        Now, I also agree that the defendant did not set out to

9   create child pornography.  That's not why he engaged with the

10  victim in this case.  He was just interested in having sex with

11  a beautiful young girl, and the fact is that, in the

12  circumstances in which the victim found herself under the sway

13  of Mr. Ragon, that creating child pornography was simply the

14  price of having sex with her, and Mr. Peggs was eager to pay

15  that price.  In fact, I think that's part of what he liked

16  because he said he liked being behind the camera.  And so I do

17  think that it is a mitigating factor that it wasn't his

18  objective when he began.  He didn't set out to be a child

19  pornographer, and I do think that's a mitigating factor, but it

20  doesn't absolve him of responsibility for what he did.  There

21  are many people who do things that they didn't set out to do

22  because they wanted something.  A person might not set out to be

23  a bank robber, but they needed the money, and so they robbed the

24  bank to get it.  And so if they have an explanation for why they

25  desperately needed the money and didn't have any, that might be

1   a mitigating explanation for me, but it doesn't absolve you of

2   responsibility for what you did.  And the fact that Mr. Peggs

3   didn't set out to have a career as a child pornographer is a

4   mitigating factor, but it doesn't really absolve him of it.  He

5   was willing to do what it took to have sex with the victim, and

6   he was willing to disregard all the warning signs that she was a

7   minor.  And so that is my assessment of the offense, which is

8   one of the first things that I have to consider in sentencing.

9       I'm also required to consider the character of the

10  defendant, and I think it would be worth beginning by saying

11  some things that I think are not true about the defendant that

12  were expressed to some degree in the letters.  And it's an

13  understandable concern, but I think it would be fair for me to

14  just put it out there that I don't think there is any evidence

15  that Mr. Peggs has any interest in prepubescent children.  He is

16  not a pedophile, and a pedophile is not someone just who is

17  interested in minors, but it's a specific disorder in which a

18  person is attracted to prepubescent children.  It's a

19  specialized disorder, and it's a very intractable problem and

20  hard to deal with, and it is a facet in many child pornography

21  cases, and it's just not part of this one.  Mr. Peggs doesn't

22  have any interest in young children.  There's no evidence at all

23  to suggest that.

24      I think it's also fair to acknowledge here that in Mr.

25  Peggs' case he did not use his position as the superintendent of

schools or his position as an educator to groom children or to
take advantage of his students.  That's not part of this case
either.  It happened to be, and it's an unfortunate
circumstance, that he was in a position as an educator, and I
think that that's not an inconsiderable factor to consider here,
that, you know, he has a special responsibility to young people,
but he did not use his position here to gain access to students.
There were no -- none of his students were at special risk
because of his position.  He was not grooming children.  So I'm
setting those things to the side.  That's not what this case is
about.

Mr. Peggs has a lot to be proud of.  He is a prominent and
successful member of the community, extraordinarily so that he
became a principal and then a superintendent at such a young
age.  He's obviously very smart, very articulate, and I also
believe that in some sense he really cares about education and
children.  But, as I said, there are many people who are able to
compartmentalize out another aspect of their lives where they
play by a different set of rules, and this is, I think, in Mr.
Peggs's case a really extraordinary example of that.  He
virtually led a double life as, on the one hand, the young
rising star superintendent and, on the other hand, Jake
Thompson, a sexual adventurer who was really just a completely
different person and was willing to do almost anything to have
sex with as many people as he could garner.  And I think that

1    the bottom line here is that when I look at Mr. Peggs, I have to

2    acknowledge that I think he's actually a very systematically

3    dishonest and very selfish person, despite his accomplishments

4    as an educator.  And I think that his sexual preoccupation has

5    driven him to a level of risk-taking that I don't think he fully

6    controls or has really fully acknowledged, and that's a very

7    scary thing.

8         Now, I want to be clear that I am not sentencing Mr. Peggs

9    for his infidelity or his sexual interests or his sexual habits.

10   That's not why we are here.  I'm sentencing Mr. Peggs for what

11   he did to the victim in this case.  I'm focusing on his conduct

12   that was the crime in this case.  But it is why I think his

13   conduct after the victim turned 18 is important.  I'll say this:

14   It was perfectly legal for him to contact the victim after she

15   turned 18.  That's not the issue.  But his reaching out to her

16   after he knew that she was a minor and had been sexually

17   exploited by Mr. Ragon and that he himself had sexually

18   exploited her when she was 17, the fact that after her birthday

19   he would turn to her again showed that he was willing to use a

20   devastated young women for his own sexual pleasure.  He wasn't

21   really interested in doing anything to help her.  The

22   correspondence suggests that it was really another sexual

23   conquest for him.  She was beautiful, and he was -- he wanted to

24   have sex with her.

25        And so this then leads me to the goals that I have to

1    accomplish in sentencing, and I've always said that the

2    protection of the public is job number one for me in this job.

3    When I'm called upon to sentence people, I think the most

4    important consideration -- this is one of those things that Mr.

5    Bugni referred to as the instrumental goal of sentencing.  So I

6    have sentencing, and I need to accomplish safety of the public,

7    and many of the factors in the Section 3553(a) of the United

8    States statutes, which lays out the factors I should consider in

9    sentencing, many of them are what I call instrumental in that

10   they're designed to protect the public.  Mr. Bugni has done his

11   best to argue that Mr. Peggs poses no risk to the public, but

12   I'm simply not persuaded, and the reason I'm not persuaded is

13   that Mr. Peggs has known for years that his sexual

14   preoccupations have placed everything that he values at risk,

15   and it has never been enough to stop him.  He has been incapable

16   of maintaining fidelity to his wife, and, again, he's not here

17   because of his unfaithfulness, but when I look at his conduct

18   and what his sexual preoccupations have driven him to do, I see

19   that there is scant limits on what it would do.  And in this

20   case it drove him to encounter the victim, and, despite all the

21   warning signs that she was a minor, he was able to set those

22   aside and proceed with arranging group sex activities with a

23   17-year-old girl.  And I don't think he fully understands those

24   proclivities, he's unable to control them, and I think that that

25   makes him a risk to the public.  So I'm not confident that he's

1    at no risk to reoffend.  I think that he has done extraordinary

2    things, and he's risked many, many things, including his career,

3    his family, and the consequences to his victim, in order to

4    satisfy his sexual desires.  So I think that a term of

5    imprisonment is needed to protect the public.

6         I also have to consider the need for deterrence.  That's

7    part of the instrumental goals.  So a punishment that is a

8    painful sacrifice for the defendant will have the effect of

9    deterring that individual from committing future crimes because

10   they don't want to endure the punishment again.  If I let Mr.

11   Peggs off with a light sentence, I think there's a risk that he

12   would return to behavior that I think is risky and dangerous and

13   perhaps victimize another person.  And I say this recognizing

14   that there are profound collateral consequences to the

15   conviction here.  Even above and beyond the sentence that I

16   impose, Mr. Peggs will be a sex offender and will be required to

17   register as a sex offender, and he has lost his job.  He will be

18   a felon.  And so even apart from any sentence I impose, there

19   are enormous consequences.  Nevertheless, I do believe that a

20   prison sentence is appropriate for deterrence, to protect the

21   public, and also, I think, to send a message of general

22   deterrence, and I think this is one of those cases where it's

23   fair to send a message to public officials and to educators that

24   this -- sexual encounters with minors will not be tolerated and

25   will be severely punished.  In addition to the instrumental

1    goals of sentencing, there are what I call the moral goals of

2    sentencing, and the sentencing factors call upon me to impose a

3    sentence that provides just punishment and that reflects the

4    seriousness of the offense, and I think that here also calls for

5    a serious punishment largely to reflect the abuse that the

6    victim endured.

7         And so synthesizing all of those things and recognizing

8    that my obligation is to the community, to protect you and to

9    make people feel that justice has been done, but also

10   recognizing that I have an obligation to Mr. Peggs to respect

11   his rights and to impose a fair sentence, I am going to decline

12   to impose a sentence at the statutory maximum.  I believe a

13   sentence of eight years incarceration is an adequate sentence to

14   serve the purposes of sentencing.  So the sentence will be eight

15   years.  That will be followed by ten years of supervised

16   release.

17        The term for which he is to register as a sex offender is

18   not a decision that I make.  He will be required to register as

19   a sex offender under the federal law, and I believe that this

20   will be a Tier 1 offense, which means that he'll be obligated to

21   register as a sex offender -- the basic term is 15 years will be

22   how long he will have to register as a sex offender, but that's

23   a consequence of the federal Sex Offender Registration and

24   Notification Act.  That's not up to me to set, so I don't

25   have -- it's not a period that I set.  All right.  So that's the

1    sentence and my justification for it.

2         We have a set of conditions that are proposed and justified

3    in the presentence report.  I know Mr. Bugni has raised

4    objections to those, or at least to some of those.  I will

5    address them generally, and then I will take any further

6    argument that Mr. Bugni has.  I'm not sentencing -- I recognize

7    that this is an unusual child pornography case in many ways, as

8    I've said before.  The set of conditions that are proposed are

9    more or less among the standard conditions for sex offender

10   cases, and I think they're appropriate here because I'm

11   sentencing Mr. Peggs for his -- for what he has done, and on the

12   basis of my explanations for why he has done it and why I think

13   he poses a risk to the public, I think these conditions are

14   appropriate in this case.

15        I observe, as I do in all cases, that these conditions can

16   be adjusted during the term of supervision.  If it turns out

17   that Mr. Peggs does well on supervision and these conditions

18   aren't all needed, they can be adjusted during the term of

19   supervision.  And, again, I recognize that Mr. Peggs does not

20   have an interest in prepubescent children, which would warrant

21   even, if anything, more extreme conditions, but I think these

22   conditions are appropriate.

23        So with that, Mr. Bugni, do you want to make any

24   particularized arguments on the conditions?

25             MR. BUGNI:  Yeah.  I'll argue a couple.

1          THE COURT:  All right.

2          MR. BUGNI:  Number one, I don't think that anything

3     that you've said would actually warrant a restriction upon his

4     ability to travel or to travel without that sort of freedom.

5     There's nothing within his crime that involved interstate travel

6     nor any travel other than two hours south to the Dells.  I think

7     it's very standard that -- I know that the response is, hey, he

8     just has to tell his probation agent, but the probation agent

9     can deny that ability to travel, and it's -- it doesn't need to

10    be that kind of imposition.

11        As far as the ability to monitor his taxes, there's nothing

12    about his crime that is touched upon by finances or anything

13    that would be helped with monitoring.

14         THE COURT:  Let me point to the real issue here is it's

15    the renting of the hotel rooms.

16         MR. BUGNI:  I don't believe you have to actually report

17    renting of the hotel rooms on your IRS -- on your taxes.

18         THE COURT:  It's the credit card receipts.

19         MR. BUGNI:  How about you can have his credit card --

20    monitor his credit cards and bank spending if that's what you'd

21    like.

22         THE COURT:  That's the objective of the condition.  I'd

23    be willing to entertain that.

24        Is there any objection from the government on that

25    modification of that condition?

1          MS. PFLUGER:  No.

2          THE COURT:  All right.  So Condition No. 13 would be

3     modified to reflect credit card and bank statements rather than

4     financial information generally.

5          I'm going to overrule your objection on Condition No. 1.  I

6     think he did travel, although the travel was within the

7     district.  I think that travel to engage in other sexual acts I

8     think is a concern that I would have.  The victim, for example,

9     in this case did travel out of state to North Carolina to engage

10    with somebody who had been engaged online, and so I think

11    Condition No. 1 is appropriate.

12         I'll amend Condition No. 13 as requested.

13         MR. BUGNI:  No more.

14         THE COURT:  All right.  And let me ask if you'd like

15    the conditions read.

16         MR. BUGNI:  No.

17         THE COURT:  All right.  So I will just reiterate the

18    conditions can be changed.  I will impose conditions 1 through

19    4, 7 through 9, and 11 through 23.  I'm also required to impose

20    the statutorily-required conditions.  There are three:  Don't

21    commit any new crimes, don't illegally possess any controlled

22    substances, and cooperate in providing a DNA specimen.

23         The point of supervision is not to trip you up and send you

24    back to prison, so I would encourage you to embrace supervision

25    that way.  Maintain a good relationship with your supervising

1    officer.  If you do that, there's almost no problem you would

2    encounter that we can't deal with short of revocation, and, as I

3    said, the conditions can be modified if that is appropriate

4    while you're on supervision.

5         The defendant doesn't have any history of drug use, and the

6    offense is not drug related, so I will waive the requirement of

7    drug testing.

8         It is adjudged that the defendant is to pay the mandatory

9    $100 criminal assessment penalty to the Clerk of Court for the

10   Western District of Wisconsin immediately following sentencing.

11   I would encourage you to fulfill your obligation to make that

12   payment so that it doesn't interfere with your participation in

13   programming in the Bureau of Prisons.

14            MR. BUGNI:  Sorry, Your Honor.

15            THE COURT:  Yes.

16            MR. BUGNI:  We already paid the special assessment.

17            THE COURT:  Very good.  I'm pleased to hear that.

18   Thank you.

19        All right.  And so I understand the parties are asking me

20   to set restitution out for 90 days in the hopes that you can

21   reach agreement or otherwise we'll have a hearing; is that

22   correct?

23            MS. PFLUGER:  Yes, Your Honor.  In the case of Bryan

24   Ragon, there was a significant restitution order, and I'm going

25   to be taking the evidence submitted in that case and submit it

1     in this case.  So it will probably be a fairly complicated

2     process, but hopefully we can work something out.

3          THE COURT:  All right.  Very good.  So I'll set

4     restitution out for 90 days.

5          I will find that the defendant does not have the means to

6     pay a fine under guideline Section 5E1.2(c) without impairing

7     his ability to support himself and his family upon release from

8     custody, so I impose no fine.

9          I have already granted the final order of forfeiture for

10    the property that was seized.

11         And I think -- do we have the -- is the $5,000 assessment

12    applicable in this case?

13         MS. PFLUGER:  No, it is not.

14         THE COURT:  It's not applicable.  Okay.  So we don't

15    have to worry about that.

16         The probation office is to notify local law enforcement

17    agencies and the state attorney general of the defendant's

18    release to the community.

19         And, by the way, I should justify the ten-year term of

20    supervised release.  The sentence of incarceration plus the

21    ten-year term of supervised release will ensure that the

22    supervision continues through the adulthood of his children.  I,

23    of course, don't have authority over his interactions with his

24    children.  I understand that's a matter for family court in

25    state court, but this term of supervision will provide a lengthy

1    period of protection of the public, but also the children will

2    be adults when this term of supervision expires.

3        Okay.  We have an indictment and a superseding indictment

4    to be dismissed.  Is the government moving to dismiss those?

5            MS. PFLUGER:  Yes, we are, Your Honor.

6            THE COURT:  Very good.

7        Mr. Bugni, have I adequately addressed your arguments in

8    mitigation?

9            MR. BUGNI:  Yes, Your Honor.

10           THE COURT:  Okay.  All right.  And, Mr. Peggs, I'm

11   going to inform you of your right to appeal.  You have a waiver

12   of your right to appeal in the agreement, so I don't think you

13   will have a right to appeal, but if there is any residual right

14   to appeal because your plea was somehow unlawful or invalid,

15   you've got the right to appeal on that limited basis, but if you

16   want to appeal, you'd have to file a notice of appeal within 14

17   days of entry of judgment or within 14 days of any notice of

18   appeal filed by the government if they were to appeal.  And if

19   you can't afford the filing fee, you could apply for leave to

20   appeal *in forma pauperis*, which means without paying the filing

21   fee, and if you can't afford an attorney to represent you, you

22   can apply for court-appointed counsel at government expense.

23       All right.  I think I have covered everything except Mr.

24   Peggs either going into custody or reporting.  So does the

25   government have a position on it?

```
1          MS. PFLUGER:  Your Honor, as we put in our sentencing
2   memo, we would request immediate detention.  There's no reason
3   to not have immediate detention.  He's known this was coming and
4   that this was a possibility.
5          THE COURT:  All right.  And is this a mandatory
6   detention case?
7          MS. PFLUGER:  I don't know.
8          MR. BUGNI:  It's -- well, sorry, Your Honor.  You've
9   already made the finding that the mandatory detention -- to
10  allow him to stay out, so the clear and convincing finding that
11  you've already made should carry through, and it should allow
12  him to get his final affairs in order.  And while this is
13  something that, you know, maybe he would have known is coming,
14  his attorney asked for probation.  Clearly I asked too low, but
15  it's one where he's shown no danger to the community.  He's
16  abided by every condition, and you can trust him to show up.  I
17  just ask that he be allowed to have the holidays with his family
18  and show up the 6th of January.
19         THE COURT:  I'll grant that request.
20         MR. BUGNI:  Thank you, Your Honor.
21         THE COURT:  So you will report to an institution that
22  I'll identify in a further court order on January 6th between
23  the hours of noon and 2:00 p.m., and the release conditions that
24  cover your conduct will be continued until that time.
25         I think I have covered everything, but let me check in.  Is
```

1    there anything else I need to address, Ms. Pfluger?

2            MS. PFLUGER:  I wasn't sure if you had given any

3    further thought or if we need to maybe brief this, but if the

4    sentencing memos could be sealed.

5            THE COURT:  Oh, yes.  This is a case of such importance

6    that I recognize the privacy interests of the victim but also

7    the public's right to know what's going on here, so I would ask

8    each of you to prepare redacted copies of your sentencing

9    memoranda so that you can redact the information about the

10   victim, and then we'll have redacted versions available to the

11   public.

12           MS. PFLUGER:  Your Honor, I believe those have already

13   been filed.  I think what the victim, from my understanding --

14   the part about her history of prostitution or things that --

15   that is very disturbing to her to be in the public.

16           MR. BUGNI:  How about this:  Why don't Ms. Pfluger and

17   I can talk afterwards, and I'll redact whatever specifics, and

18   I'll file something for you.

19           THE COURT:  All right.  Does that work?

20           MS. PFLUGER:  Yes.

21           THE COURT:  All right.  Because I do think there's

22   keen -- as evidenced by the people in the courtroom here,

23   there's a keen interest in the case, and I think the public has

24   a right to know, but I do respect the victim's privacy, so work

25   that out.  I can referee any quibbles that you have about it.

1          All right.  So, Ms. Pfluger, is that it?

2              MS. PFLUGER:  Yes.

3              THE COURT:  Mr. Bugni?

4              MR. BUGNI:  Yes, it is, Your Honor.

5              THE COURT:  Anything else, Ms. Stieve?

6              OFFICER STIEVE:  Does the Court have any

7      recommendations for programming in the BOP?

8              THE COURT:  That is a good point.  I did skip over

9      that.  So, yes, I would recommend that you be afforded

10     prerelease placement in a residential re-entry center with work

11     release privileges.  I will recommend that you receive sex

12     offender treatment and also that you be allowed to participate

13     in vocational programming while you're incarcerated.

14         All right.  Thank you, all.

15             THE CLERK:  All rise.  This court stands in recess.

16         (Proceedings concluded at 3:36 p.m.)

17                              ***

18

19

20

21

22

23

24

25

```
 1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

 2     Reporter in and for the State of Wisconsin, certify that the

 3     foregoing is a true and accurate record of the proceedings held

 4     on the 2nd day of December, 2021, before the Honorable

 5     James D. Peterson, Chief U.S. District Judge for the Western

 6     District of Wisconsin, in my presence and reduced to writing in

 7     accordance with my stenographic notes made at said time and

 8     place.

 9          Dated this 28th day of December, 2021.

10

11

12

13

14

15                         _____/s/ Jennifer L. Dobbratz_____

16                         Jennifer L. Dobbratz, RMR, CRR, CRC
                                   Federal Court Reporter
17

18

19

20

21

22

23

24     The foregoing certification of this transcript does not apply to
       any reproduction of the same by any means unless under the
25     direct control and/or direction of the certifying reporter.
```